Bethilda Betty PHILLIPS, Widow and Personal Representative of Walter Phillips, deceased, Plaintiff-Appellant,

v.

AMOCO TRINIDAD OIL COMPANY, and Santa Fe Drilling Company, Defendants-Appellees.

No. 78-2672.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 5, 1980.

Decided Sept. 29, 1980.

Rehearing Denied Nov. 19, 1980.

Aram B. G. Adler, Philadelphia, Pa., argued for plaintiff–appellant; Bodle, Fogel Julber, Reinhardt & Rothschild, Los Angeles, Cal., on brief.

Sheldon A. Gebb, Los Angeles, Cal., Winston E. Rice, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., argued for defendants–appellees; Bill E. Schroeder, Los Angeles, Cal., on brief.

Before WALLACE and SCHROEDER, Circuit Judges, and CORDOVA,* District Judge.

WALLACE, Circuit Judge:

Plaintiffs appeal from a district court determination that the law of Trinidad, rather than United States maritime law, applies to two wrongful death actions and 12 personal injury actions filed on behalf of citizens and domiciliaries of Trinidad against Amoco Trinidad Oil Co. (Amoco Trinidad) and Santa Fe Drilling Co. (Santa Fe). The district court certified its order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), and we granted plaintiffs' petition for permission to appeal. Finding that the district court properly applied controlling choice–of–law principles, we affirm.

I.

The accident giving rise to this litigation occurred on December 5, 1973, during the course of exploratory drilling operations with the drilling rig Mariner I. Plaintiffs brought their claims pursuant to the Jones Act, 46 U.S.C. § 688.

Mariner I is a special–purpose, submersible drilling vessel which must be towed to its drilling site. The rig was documented under the laws of the United States and flew an American flag. It was also licensed to operate in Trinidad waters by the government of that nation. At the time of

* Honorable Valdemar A. Cordova, United States District Judge, District of Arizona, sitting by designation.

the accident, Mariner I was drilling under contract to Amoco Trinidad, 10.5 miles from the Trinidad coast, in that nation's territorial waters. Indeed, Mariner I worked exclusively offshore of Trinidad from February 1970 to March 1976.

Santa Fe owns and operates Mariner I. It is an American–based corporation with headquarters in Orange, California. Although the Orange headquarters monitored and maintained some control of the operation of Mariner I, day–to–day operational decisions were made by Santa Fe staff in Trinidad. Plaintiffs also allege that Amoco Trinidad is an owner of Mariner I. Amoco Trinidad is a Delaware corporation, with its principal offices and places of business in Trinidad. The president of Amoco Trinidad resides in Trinidad, where all operational decisions are made.

Eleven of the injured workers were Santa Fe employees. The remaining three were employed by Schlumberger Trinidad, Inc., a Panamanian corporation, not party to this litigation. Plaintiffs are all citizens and domiciliaries of Trinidad. The Santa Fe employees were hired pursuant to a collective bargaining agreement between Santa Fe and the local Trinidad Oil Field Workers Union. The Trinidad government controlled the make–up of Mariner I's work force by limiting the number of work permits for non–Trinidad nationals. A Trinidad statute directs that the civil law of Trinidad applies to any acts or omissions occurring in the course of the exploration or exploitation of its continental shelf.

## II.

The question presented is whether the district court correctly determined that the law of Trinidad, rather than the Jones Act, applies to this case. This is a question of law subject to our *de novo* review.

■ Plaintiffs contend that the Jones Act applies whenever a claimant can show that he is a "seaman" as defined by the

statute. 46 U.S.C. § 688.[1] Read literally, the Act would provide that an injured seaman of any nationality could maintain an action against any party over whom he could gain personal jurisdiction. But courts have never applied the Jones Act as broadly as a literal reading of it would require. The Supreme Court has indicated that the Jones Act applies "only to areas and transactions in which American law would be considered operative under prevalent doctrines of international law." *Lauritzen v. Larsen,* 345 U.S. 571, 577, 73 S.Ct. 921, 926, 97 L.Ed. 1254 (1953). Thus, we must first determine, by the application of relevant choice–of–law criteria, whether the Jones Act applies in the particular factual setting of this case. *See Romero v. International Terminal Operating Co.,* 358 U.S. 354, 382, 79 S.Ct. 468, 485, 3 L.Ed.2d 368 (1959); *Lauritzen v. Larsen, supra,* 345 U.S. at 576–83, 73 S.Ct. at 925–928; *Chirinos de Alvarez v. Creole Petroleum Corp.,* 613 F.2d 1240, 1245–46 (3d Cir. 1980); *Moncada v. Lemuria Shipping Corp.,* 491 F.2d 470, 472 (2d Cir.), *cert. denied,* 417 U.S. 947, 94 S.Ct. 3072, 41 L.Ed.2d 667 (1974).

### A. Lauritzen *and* Rhoditis

The relevant considerations for maritime choice–of–law decisions were set forth and applied in *Lauritzen v. Larsen, supra,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254, and *Hellenic Lines, Ltd. v. Rhoditis,* 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970). In *Lauritzen,* the Supreme Court enumerated seven factors that bear on whether the Jones Act applies: (1) the place of the wrongful act; (2) the law of the flag; (3) the allegiance or domicile of the injured; (4) the allegiance of the defendant shipowner; (5) the place of contract; (6) the inaccessibility of the foreign forum; and (7) the law of the forum. *Lauritzen* taught that the appropriate law to apply would be determined by "ascertaining and valuing [the enumerated] points of contact between the transaction and the states or governments whose competing laws are involved." 345 U.S. at 582, 73 S.Ct. at 928.

---

1. Section 688 states in part: "Any seaman who shall suffer personal injury in the course of his employment may, . . . maintain an action

for damages at law, . . . ." 46 U.S.C. § 688.

As the only factor pointing toward the application of American law in *Lauritzen* was the place where the plaintiff's maritime contract was signed, it was clear that the Jones Act did not apply. Nevertheless, the Court provided some general guidelines to consider in the "valuing" and "weighing" of the various factors. *Id.* Among other things, the Court in *Lauritzen* stressed that the law of the flag is generally of cardinal importance in maritime choice–of–law decisions, *id.* at 584–86, 73 S.Ct. at 929–930, and it suggested that the last two enumerated factors should be given very little weight. *Id.* at 589–91, 73 S.Ct. at 931–932.

In *Hellenic Lines, Ltd. v. Rhoditis, supra,* 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252, the Supreme Court found that the Jones Act applied to a Greek seaman's claim, although most of the *Lauritzen* factors, including the law of the flag, pointed toward the application of foreign law.[2] *Rhoditis* not only stressed that "[t]he *Lauritzen* test . . . is not a mechanical one," 398 U.S. at 308, 90 S.Ct. at 1733, but found that "the list of seven factors in *Lauritzen* was not intended as exhaustive." *Id.* at 309, 90 S.Ct. at 1734. Announcing an additional "base of operations" test, the Court found that the connection between this country and the subject ship's commercial and shipping operations was substantial enough to warrant application of the Jones Act. *Id.* at 309–310, 90 S.Ct. at 1734–1735.

### B. *The Nature of the Test*

■ The parties before us disagree on the weight to be accorded the various relevant connections between the United States and the maritime operations of Mariner I. Some of this disagreement stems from contrasting interpretations of *Lauritzen* and *Rhoditis.*

The parties agree that the choice–of–law test is not a mechanical one and that the factors are not necessarily accorded equal weight. *Lauritzen v. Larsen, supra,* 345 U.S. at 582, 73 S.Ct at 928; *Hellenic Lines, Ltd. v. Rhoditis, supra,* 398 U.S. at 308–09, 90 S.Ct. at 1733–1734. Courts have also indicated that particular factors will merit varying degrees of consideration from case to case. *See Moncada v. Lemuria Shipping Corp., supra,* 491 F.2d at 472; *House v. Santa Fe Int'l Corp.,* 1978 A.M.C. 1899, 1902 (S.D.Tex.1978). Factors that have little significance in one factual setting may warrant greater weight in another.

Plaintiffs place great weight on the statement in *Rhoditis* that "[t]he significance of one or more factors must be considered in light of the national interest served by the assertion of Jones Act jurisdiction." 398 U.S. at 309, 90 S.Ct. at 1734 (footnote omitted). We agree that the *Lauritzen* factors should be applied with sensitivity to the national interest that may be served by the assertion of American maritime law in a particular case. Yet we do not read *Rhoditis* as undercutting the equally valid teaching of *Romero v. International Terminal Operating Co., supra,* that the *Lauritzen* factors should be applied "with due recognition of our self–regarding respect for the relevant interests of foreign nations . . . ." 358 U.S. at 382–83, 79 S.Ct. at 486.[3] *See also Lauritzen v. Larsen,*

**2.** In *Rhoditis,* the plaintiff was a Greek citizen who, while in Greece, signed on as a seaman on a ship owned by a Greek corporation. His contract of employment provided that Greek law and a Greek collective–bargaining agreement applied to claims arising out of his employment. Rhoditis, the plaintiff, was injured while on board the ship in the Port of New Orleans. The record showed that the Greek corporation Hellenic Lines, was owned by a United States domiciliary, a lawful permanent United States resident alien, who was a Greek citizen. Hellenic Lines' largest offices were in New York and another was in New Orleans. The corporation's owner lived in Connecticut and managed the corporation

out of New York. The record also showed that "its entire income is from cargo either originating or terminating in the United States." 398 U.S. at 308, 90 S.Ct. at 1733. *Chirinos de Alvarez v. Creole Petroleum Corp.,* 613 F.2d 1240, 1246 n. 7 (3d Cir. 1980).

**3.** Although *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959), involved claims under general maritime law, rather than the Jones Act, the Court made it clear that the same analysis applies to both. "[T]he similarity in purpose and function of the Jones Act and the general maritime principles of compensation for personal injury, admit of no rational differentia-

*supra*, 345 U.S. at 582, 73 S.Ct. at 928; *DeMateos v. Texaco, Inc.*, 562 F.2d 895, 901 (3d Cir. 1977), *cert. denied*, 435 U.S. 904, 98 S.Ct. 1449, 55 L.Ed.2d 494 (1978).

The plaintiffs' apparent belief that the crux of choice–of–law analysis is the abject furtherance of American interests leads them to urge an unrealistic interpretation of language in certain Second Circuit decisions. The Second Circuit has stated that "each factor is to be 'weighed' and 'evaluated' only to the end that, after each factor has been given consideration, a rational and satisfactory conclusion may be arrived at on the question of whether all the factors present add up to the necessary substantiality." *Bartholomew v. Universe Tankships, Inc.*, 263 F.2d 437, 441 (2d. Cir.), *cert. denied*, 359 U.S. 1000, 79 S.Ct. 1138, 3 L.Ed.2d 1030 (1959), *quoted in Hellenic Lines, Ltd. v. Rhoditis, supra*, 398 U.S. at 309 n. 4, 90 S.Ct. at 1734. Under this "substantiality" test, the "task is not to weigh or balance present against absent contacts, but merely to determine whether the contacts which are present are substantial." *Moncada v. Lemuria Shipping Corp., supra*, 491 F.2d at 472.

■ We accept that *Lauritzen* does not require us to balance present against absent connections between the United States and the relevant transaction. There is little doubt that sufficient American interest in a particular transaction can rest on the presence of one or more important contacts between that transaction and this country. But this does not imply that the substantiality of this nation's interests is to be measured in a vacuum. Substantiality is a relative term, and *Lauritzen* requires that we compare the substantiality of our interest in a given transaction with that of other nations. In defining "the domain which each nation will claim as its own," we are

instructed to value "points of contact between the transaction and *the states or governments whose competing laws are involved.*" *Lauritzen v. Larsen, supra*, 345 U.S. at 582, 73 S.Ct. at 928 (emphasis added). Although the Jones Act may be far–reaching under certain circumstances, there is also no doubt that "when the links to the United States are weak and the interests of another sovereign are substantial, the Jones Act is not applicable." *Chirinos de Alvarez v. Creole Petroleum Corp., supra*, 613 F.2d at 1246. This is a comparative, and not an absolute, evaluation.

### III.

■ We next apply the factors elucidated in *Lauritzen* and *Rhoditis* in light of the foregoing principles. Our comparison of the points of contact between this transaction and the two nations persuades us that the interests of the United States are weaker and less substantial than the interests of Trinidad. Our analysis turns in large part on Trinidad's strong interest in the conduct of the Mariner I offshore drilling operation. As we indicated above, we are required to determine the weight which should appropriately be given the various factors in the factual setting of this particular transaction. Having done so, we agree with the district court that the law of Trinidad applies.

■ Factors unambiguously pointing toward the application of American law, and hence the Jones Act, include the law of the flag, the allegiance of the defendant shipowner, and the law of the forum. If this were a typical maritime case involving a vessel sailing in international commerce, it would appear that American law would apply.[4] We have determined, however, that the law of the flag should not be accorded

---

tion of treatment for choice of law purposes." *Id.* at 382, 79 S.Ct. at 485.

4. In *Lauritzen v. Larsen*, 345 U.S. 571, 585, 73 S.Ct. 921, 930, 97 L.Ed. 1254 (1953), the Court stated that "the weight given to the ensign overbears most other connecting events in determining applicable law." Although the law of the flag was not given controlling weight in

*Rhoditis*, where the Court applied American law to a foreign–flag ship, commentators have generally assumed that American maritime tort law will follow the flag. *See, e. g.*, G. Gilmore & C. Black, The Law of Admiralty 477 (2d ed. 1975); 2 M. Norris, The Law of Seamen § 684 (3d ed. 1970).

controlling weight because of the facts of this case.

In *Lauritzen*, the Court stated that the law of the flag has traditionally been accorded great weight "on the pragmatic basis that there must be some law on shipboard, that it cannot change at every change of waters, and no experience shows a better rule than that of the state that owns her." 345 U.S. at 585, 73 S.Ct. at 930. This rationale does not apply to a drilling vessel whose operations are at a fixed location. Here the locus is unchanging, and the logic of local experience can profitably be applied to the claims of these Trinidad nationals. That these workers were injured immediately offshore of Trinidad is no fortuity, unlike the place of injury on a commercial sailing vessel.

Because of the nature of the operations in this case, we place greater weight on the place of the wrongful act than did the Court in *Lauritzen* on different facts. We agree with the analysis of the District Court of Maryland in confronting facts similar to ours:

> The *Lauritzen* case recognizes that the most commonly accepted basis in international law for selecting tort rules of decision is by reference to the place where the liability arose. This reflects the strong interest of a nation in the activity which goes on within its sovereign territory. [*Lauritzen*] noted, however, the impracticality of such a rule when applied "to an enterprise conducted under many territorial rules and under none," and observed that the "more constant law of the flag" is ordinarily applied to vessels which ply international waters from port to port. But such pragmatic considerations do not make the interest of a sovereign in activities occurring within its borders any less. Where, as here, the enterprise giving rise to the liability is con-

ducted solely within one jurisdiction, that interest should be given substantial weight . . . in making a choice of law decision.

*de Alvarez v. Creole Petroleum Corp.*, 462 F.Supp. 782, 787 (D.Del.1978), aff'd sub nom. *Chirinos de Alvarez v. Creole Petroleum Corp., supra*, 613 F.2d 1240 (footnote omitted).[5]

For similar reasons, we place greater weight on the allegiance and domicile of these workers and on the place of contract than on the allegiance of the defendant shipowner. *Lauritzen* stated that "each nation has a legitimate interest that its permanent inhabitants be not maimed or disabled from self-support." 345 U.S. at 586, 73 S.Ct. at 930. And, although the allegiance of the injured seaman has not always been given controlling weight, *e. g., Hellenic Lines, Ltd. v. Rhoditis, supra*, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252, there are substantial reasons for placing greater emphasis on this factor here. The workers here were Trinidad nationals whose employment never took them beyond its territorial boundaries. *See Chirinos de Alvarez v. Creole Petroleum Corp., supra*, 613 F.2d at 1247. Moreover, the Santa Fe workers were hired through a local labor union and their numbers were fixed by the law of Trinidad. The other workers were also citizens of Trinidad who were employed by the non–party Panamanian corporation.

The place of contract also assumes added significance in this case, because of the fixed location of the employment and the workers' consequent reasonable expectations as to the governing law.[6] Whereas the place of contract of the typical seaman is fortuitous, since "a ship takes on crew in any port where it needs them," *Lauritzen v. Larsen, supra*, 345 U.S. at 588, 73 S.Ct. at 931, the allegiance and place of contract of these workers was uniform, predictable, and unchanging.

---

**5.** Although the vessel involved in *Creole Petroleum Corp.* did not fly an American flag, the court's analysis is still helpful.

**6.** The Santa Fe workers had signed contracts of hire that stipulated that the law of Trinidad would apply to claims arising out of their em-

ployment. Although such a clause was not weighted heavily in *Hellenic Lines, Ltd. v. Rhoditis*, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970), we think the clauses here reflect the reasonable expectations of these Trinidad workers.

Our analysis and application of the base–of–operations test suggested by *Rhoditis* confirms our conclusion that this transaction is within the domain of Trinidad's laws. Plaintiffs observe that in *Rhoditis* the Court focused on the *"shipowner's"* base of operations, 398 U.S. at 309, 90 S.Ct. at 1734, and argue that the relevant base of operations of Santa Fe is the United States. It is true that Santa Fe is based in Orange, California, and that its Orange offices were involved in monitoring and controlling the overall operations of Mariner I. We conclude, however, that the more relevant and important base of operations for determining choice–of–law in this case is in Trinidad. We thus follow cases that have focused on the base of operations of the relevant business venture rather than of the corporate owner of the vessel. This is consistent with the injunction that we weigh the "connecting factors between the *shipping transaction regulated* and the national interests served by the assertion of authority." *Lauritzen v. Larsen, supra*, 345 U.S. at 582, 73 S.Ct. at 928 (emphasis added). *See DeMateos v. Texaco, Inc., supra*, 562 F.2d at 902; *de Alvarez v. Creole Petroleum Corp., supra*, 462 F.Supp. at 786 n. 11;[7] *House v. Santa Fe Int'l Corp., supra*, 1978 A.M.C. at 1905.

In making this judgment, we emphasize that Mariner I was conducting a substantial and rather permanent operation under license from the Trinidad government within the territory of that nation. The day–to–day operation was conducted and supervised by the Santa Fe staff in Trinidad. In *House v. Santa Fe Int'l Corp., supra*, which concerned an accident involving an oil rig operation similar to the one before us here, the United States offices of the defendant American corporation controlled the finances, hiring, making of contracts, and purchase of supplies and replacement parts.

1978 A.M.C. at 1904. The drilling rig was also an American–flag vessel. Nevertheless, the court found that "the matters concerning ownership of the vessel and corporate relationships are intangible to the point of being ephemeral in the face of the tangible, operative factors" showing that the overall transaction was more closely connected to Great Britain. *Id.* at 1905. We think that similar analysis is persuasive.[8]

■ Finally, we address arguments of the plaintiffs that go beyond the scope of the factors outlined in *Lauritzen* and *Rhoditis*. Plaintiffs contend that the United States has a strong interest in applying American law to a vessel which it has registered. They observe that their claim is founded in part on Mariner I's alleged violation of safety requirements of its Coast Guard Certificate of Inspection and contend that the United States has a significant stake in assuring compliance. We conclude that this asserted regulatory interest should not be given significant weight beyond the consideration already given the law of the flag in balancing the relevant contacts. Plaintiffs' argument ignores that Mariner I also operated under license from the government of Trinidad. Trinidad statutory law dictates that its own civil law applies to all accidents that occur while exploiting its continental shelf. The question before us is whether the United States or Trinidad has the greater interest in having its legal standards applied to these facts. Trinidad has the greater interest.

■ The plaintiffs also urge that it would be unfair to deny the benefits of American law to these Trinidad nationals and that the Jones Act would apply if these workers were American citizens. *See Farmer v. Standard Dredging Corp.*, 167

---

**7.** In *Creole Petroleum, supra*, the Third Circuit did not rely on the district court's conclusion that the more relevant base of operations was that of the particular maritime operation in question. *See* 613 F.2d at 1247. This was because Creole Petroleum's general base of operations, like defendant Amoco Trinidad's, was clearly not in the United States. Nevertheless,

we find the reasoning of the district court to be persuasive.

**8.** We reject plaintiff's contention that *House* is distinguishable as involving only general admiralty claims rather than claims arising under the Jones Act. *See* note 3 *supra*.

F.Supp. 381, 383 (D.Del.1958). But the allegiance of the injured seaman has always been viewed as a relevant and important consideration in determining the appropriate law to apply. We know of no authority for the view that foreign nationals may predicate a right to have American law applied on the rights of similarly situated American citizens. The suggestion that one follows from another is another "variety of social jingoism, which presumes that the 'liberal purposes' of American law must be exported to wherever our multinational corporations are permitted to do business." *DeMateos v. Texaco, Inc., supra*, 562 F.2d at 902; *Chirinos de Alvarez v. Creole Petroleum Corp., supra*, 613 F.2d at 1247–48. We are convinced that there is no unfairness to these plaintiffs in applying the law of the nation that clearly has the most substantial interest in their claims.

AFFIRMED.