GULF TRADING & TRANSPORTATION
CO., and Permal Shipping Co.,
Plaintiffs-Appellees,

v.

The M/V TENTO, her engines, tackle,
boilers, etc., in rem, Defendant,

I/S NOREXIM, Claimant-Appellant.

Nos. 80–4151, 80–4158 and 80–4176.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 15, 1981.

Decided Dec. 20, 1982.

**1192**

D. Thomas McCune, Lillick, McHose & Charles, San Francisco, Cal., for claimant-appellant.

Eric Danoff, Graham & James, San Francisco, Cal., for plaintiffs-appellees.

Before KENNEDY and TANG, Circuit Judges, and HOFFMAN,* District Judge.

KENNEDY, Circuit Judge:

This case presents certain choice of law questions respecting maritime liens. Liens were filed against the M/V Tento (Tento) when it docked at the Port of Stockton, in the Eastern District of California. The underlying claims arose from two separate transactions, the first with Gulf Trading & Transportation Company (Gulf), the second with Permal Shipping Company (Permal).

The Tento is a Norwegian flag vessel owned by I/S Norexim (Norexim), a Norwegian corporation. Norexim placed the Tento under time charter to Aspen Steamship Company (Aspen), and Aspen subchartered to Coin, S.A. (Coin). Both Coin and Aspen operated from New York City. Norexim's charter to Aspen provided that United States law would govern certain aspects of the agreement and that the charterer was responsible for obtaining the Tento's fuel oil. The Tento had made a signifi-

cant number of voyages to United States ports in the past[1] and on the voyage giving rise to the claim it embarked from the United States for the Suez Canal.

While Tento was enroute, Coin decided to refuel it in Italy, and the Gulf transaction resulted. One Rodriguez acted for a New York based company that had served as an agent for Coin. At Coin's instance, Rodriguez asked a fuel broker in New York City to order oil for the Tento to be bunkered in Italy. The broker contacted Gulf Oil Corporation at its New York sales office and made an oral contract for sale and delivery of fuel oil.

Gulf, a Delaware corporation, used an Italian company, AGIP, to deliver the fuel oil in Italy. Gulf paid AGIP and charged the Tento $105,447.46. As one might predict at this point, neither Coin, as subcharterer, nor Norexim, as owner, paid the invoice.

The second transaction was with Permal, a New York corporation. Again on Coin's behalf, Rodriguez requested Permal in New York City to advance approximately $40,000 for the Tento's Suez Canal transit. Permal complied and sent invoices, but $12,376.91 is still owing.

Gulf and Permal initiated *in rem* actions against the Tento by arresting the vessel in Stockton, California. The charter having terminated, Norexim was operating the vessel. The vessel posted security and Norexim appeared to defend the actions against the vessel. Gulf asserted a maritime lien for the fuel oil, and Permal asserted a maritime lien for the canal expenses.

Here and in the district court, Norexim contended that Italian and Egyptian law govern the Gulf and Permal transactions respectively, and that under those laws the owner's vessel is not subject to liens for expenses incurred by the sub-charterer.[2] It

---

* Honorable Walter E. Hoffman, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

1. Before being chartered to Coin, the Tento had just been to Providence (Rhode Island), Bridgeport (Connecticut), and Baltimore. Following

the charter with Coin, the ship went to Philadelphia, Savannah (Georgia), New York, Providence, and Boston before it left for Egypt.

2. The parties agree that the courts of neither Norway nor Egypt would recognize a maritime

argued Italian and Egyptian law control because the correct choice of law is determined by a single point of contact for the separate transactions, namely, the country where the supplies were obtained. In the alternative, Norexim asserted that even if the choice of law were made by weighing all the points of contact in each transaction, Italian law rules the Gulf transaction and Egyptian law the Permal one. Rejecting Norexim's arguments, the district court determined United States law applies to each transaction, and we affirm.

In *Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), the Supreme Court was required to resolve a choice of law question in a maritime tort suit under the Jones Act. The Court adopted an approach similar to the second Restatement of Conflicts. *See* Restatement (Second) of Conflict of Laws § 6 (1971). The Court's approach was to set forth the points of contact between the transaction and various jurisdictions and to weigh and evaluate them. *Id.* at 582, 73 S.Ct. at 928. Its review included the place of the wrongful act, the flag of the ships, allegiance or domicile of the injured seaman, allegiance of the shipowner, place of signing the employment contract, accessibility of a foreign court, and the law of the forum.

In a subsequent decision, the Supreme Court declared that the factors in *Lauritzen* were not exhaustive. *Hellenic Lines, Ltd. v. Rhoditis,* 398 U.S. 306, 309, 90 S.Ct. 1731, 1734, 26 L.Ed.2d 252 (1970).[3] The vessel's "base of operations," that is, the shipowner's center of management and the location most benefited economically by the business of the vessel,[4] is also relevant. *Id.* at 309, 90 S.Ct. at 1734. The Supreme Court has extended the *Lauritzen* approach to "guide courts in the application of maritime law generally." *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 382, 79 S.Ct. 468, 485, 3 L.Ed.2d 769 (1959).

Norexim argues that in certain situations the *Lauritzen* analysis demands resort to a single contact to solve choice of law problems. In support of its theory, it points to *McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 19, 83 S.Ct. 671, 676, 9 L.Ed.2d 547 (1963), where the Supreme Court intimated that *Lauritzen's* balance of contacts theory should not be pushed to extreme, but that in certain circumstances the appropriate rule is to focus on a single point of contact.

Norexim asserts further that the needs of the shipping industry make it appropriate for courts to determine supply cases by resort to the single factor of the law of the place where the supplies were delivered. It posits that predictability of result is particularly important in mercantile transactions, and that reference to the law of the place of supply to resolve rights of the parties would lend certainty to such transactions. The use of a general contacts approach, according to Norexim, creates confusion because vessels attract contacts "as easily as their hulls grow barnacles." Norexim claims, moreover, that the burden of learning foreign law should be on suppliers such as Gulf and Permal because such companies have chosen to sell on a multinational scale. We reject these arguments.

The Second Circuit has already discredited the notion that choice of law in maritime lien cases should be made by look-

---

lien for advances made at the request of a vessel's time charterer, and that Italian law would determine maritime lien rights by reference to the law of the ship's flag, in this case, the law of Norway. Hence, by obtaining the imposition of Italian and Egyptian law, Norexim seeks to avoid the liability that it would incur under United States law for the obligations of its charterer. We have made no independent determination on these points.

**3.** The Court further explained that the test was not a mechanical one and that the "significance of one or more factors must be considered in light of the national interest served by the assertion of [a state's] jurisdiction." 398 U.S. at 309, 90 S.Ct. at 1734.

**4.** The "base of operations" criterion has been employed frequently since the *Rhoditis* decision. *See, e.g., Fisher v. Agios Nicolaos,* 628 F.2d 308, 317 (5th Cir.1980), *cert. denied,* 454 U.S. 816, 102 S.Ct. 92, 70 L.Ed.2d 84 (1981); *Mattes v. National Hellenic American Line, S.A.,* 427 F.Supp. 619, 622 (S.D.N.Y.1977).

ing solely to the law of the place of supply. *Rainbow Line, Inc. v. M/V Tequila,* 480 F.2d 1024, 1026 & n. 5 (2d Cir.1973).[5] Instead, the court required consideration of all points of contact with the various nations.

Though we have not ruled on the appropriate approach for choice of law in the context of maritime liens, to hold that the choice of law in such cases is controlled by the significance of multiple contacts is consistent with our previous holdings, both in maritime cases involving other types of disputes and in non-maritime contract choice of law cases. A single contact approach would run counter to an important principle, which is the desirability, even the necessity, of accommodating the legitimate interests of separate sovereignties in vindicating their own legal policies. *Lauritzen,* 345 U.S. at 582, 73 S.Ct. at 928. This principle is of special import in admiralty, where international relations are delicate. In *Phillips v. Amoco Trinidad Oil Co.,* 632 F.2d 82 (9th Cir.1980), *cert. denied,* 451 U.S. 920, 101 S.Ct. 1999, 68 L.Ed.2d 312 (1981), a wrongful death and injury case, we held that the Jones Act did not apply to an accident occurring at a foreign based operation though the operator was an American based corporation with headquarters in California. We reviewed the factors listed in *Lauritzen,* noted that the list was not exhaustive, and stressed the importance of sensitivity to the interests of other nations. *Id.* at 84–85. In *Commercial Ins. Co. v. Pacific-Peru Construction Co.,* 558 F.2d 948, 952 (9th Cir.1977), we referred to general choice of law doctrines to determine that contract choice of law issues were governed by the various contacts set forth in the Restatement. Similarly, we conclude here that all relevant contacts must be considered in maritime lien cases.

Our holding is consistent with congressional policy. When it amended the maritime lien provisions of the Ship Mortgage Act, 46 U.S.C. ch. 25, §§ 911–984 (1976), Congress demonstrated its intent

that maritime liens be enforced even if it was the charterer rather than the owner who had ordered the supplies giving rise to it. *Id.* at § 973. Before the amendment had been passed, it appeared that a prohibition of lien clause in a charter party barred the supplier from acquiring a lien on a vessel for necessaries furnished to it. The statute then in effect permitted a supplier to acquire such a lien despite a prohibition of lien clause in the charter agreement. Faced with a situation similar to the one before this court, Congress determined that the vessel, and not the American supplier, should bear the burden when a charterer has not paid for its supplies. The legislative history stated:

> Your Committee gave careful consideration to this problem of American materialmen where the owner, by chartering or surrendering possession of the vessel, clothes the master thereof with at least apparent authority to bind the vessel for necessaries furnished to the vessel. The question presented was where a loss occurs in this situation, whether it should be suffered by the owner of the vessel, or the American materialman who furnished such necessaries in good faith.

> After careful consideration of the entire record, your Committee has concluded that, as a matter of equity, the owner should bear the loss in such a situation. As a practical matter, the owner can more easily protect himself contractually by bonds or otherwise at the time he charters the vessel, than can the American materialman who furnishes necessaries to a vessel under great economic pressure to put back to sea.

H.R.Rep. No. 92–340, 92d Cong., 1st Sess. 1, 3, *reprinted in* [1971] U.S.Code Cong. & Ad.News 1363, 1365.

Norexim's reliance on *McCulloch,* 372 U.S. at 10, 83 S.Ct. at 672, to support its place of supply theory is misplaced by reason of the differences in congressional poli-

---

5. The court disapproved of one pre-*Lauritzen* decision which had intimated that the sole relevant contact was the place of supply. 480 F.2d at 1026 & n. 5.

cy applicable here and the policy before the court in *McCulloch*. *McCulloch* involved the reach of the National Labor Relations Act. The Court determined that it could not extend a statute regulating labor conditions to an alien crew without a clear congressional mandate. To do so would be an intrusion upon the internal affairs of a foreign sovereign absent congressional assent. The Court then noted that the legislative history of the Act characterized the law as " 'a bill of rights both for *American* workingmen and for their employers.' " *Id.* at 20, 83 S.Ct. at 677. The record not only was void of congressional approval for application of American law to such cases, but also it hinted congressional hostility to the idea. For this reason, the Court gave special importance to the law of the flag of the ship.

■ In the instant matter, Congress has expressly identified important policy reasons for extending the reach of the lien statute to foreign shipowners. A shipowner can protect itself by bonding the charterer or by dealing only with reliable charterers. It is not, moreover, inequitable to require shipowners whose charterers make orders on a multinational level to know the law of the nation in which their charterers have extensive contacts. H.R.Rep. No. 92–340, 92d Cong., 1st Sess. 1, 3, *reprinted in* [1971] U.S.Code Cong. & Ad.News 1363, 1365. It is appropriate for the court to adopt choice of law rules consistent with congressional policy.

■ There are further reasons why designating the place where supplies are furnished as the predominant source of governing law would be unwise in the maritime context. Maritime agreements are often made in locations different from the place where supplies are taken on board. The point of loading may be quite irrelevant to the expectations of the parties or to the national interests of the countries most concerned with the transaction. The case before us is an example. The Gulf transaction was negotiated in New York, and the principal contracting parties had offices there. That the fuel was bunkered in Italy was dictated in large part by the fortuity of the ship's location and intended route.

The determination where supplies are furnished in some cases may entail a metaphysical analysis bearing little relation to the interests of nations most affected by the transaction. In this case, for instance, the right of transit through the Suez Canal was an intangible. It would be a complex, and largely irrelevant, question to determine where the parties acquired that right.

Thus, a test giving dominance to the location where supplies were delivered does not have even the advantage of simplicity to recommend it. Were the place of furnishing supplies to provide the law for resolving each contractual dispute involving a ship of marginal solvency which stops at many ports, we would be required to embark upon an odyssey in foreign law that both we and the bar would soon regret. Judicial efficiency is a relevant factor in choice of law analysis, *see Commercial Ins. Co.,* 558 F.2d at 952, and it is not served by the place of supply rule advocated here.

■ We hold that choice of law questions involving maritime liens are to be resolved by weighing and evaluating the points of contact between the transaction and the sovereign legal systems touched and affected by it. This is not to say that multiple contacts are used merely as a device to determine which sovereign has the most compelling governmental interest in a transaction. *See Liew v. Official Receiver and Liquidator,* 685 F.2d 1192 (9th Cir.1982) (discussing the governmental interest and comparative impairment approach under California law). The interests of competing sovereigns may be taken into account without rejecting altogether the contacts the bar and the maritime industry are accustomed to weigh in making the initial determination of governing law.[6] At least in the present case, these goals are not in conflict

---

6. We are aware that some courts have chosen not to balance the interests of the United States with those of other nations, but have phrased the question as whether the contacts to the United States were substantial enough to allow a court to effectuate the purposes of American law. *See, e.g., Fisher,* 628 F.2d at 316; *Bartholomew v. Universe Tankships, Inc.,* 263 F.2d

with each other. Given the substantial contacts between the United States and the Gulf and Permal transactions, they point towards United States law as the most appropriate for resolving this litigation. The Tento had significant trade at United States ports. The injured parties here were United States companies approached by other United States companies in New York City, and their agreements were made there.[7] This is not the case of a United States corporation entering into a supply agreement overseas with a foreign company. There are not even any injured foreign parties; AGIP was paid. Finally, Norexim had contracted for the application of American law with reference to its charter, even if not with the claimants before us.[8] Arguments that the ship carried a Norwegian flag, had a Norwegian owner, and received some of its supplies in Italy and Egypt, are happenstance and insubstantial by comparison. These factors do not warrant applying the laws of either Norway, Italy, or Egypt.

AFFIRMED.

---

437, 440–41 (2d Cir.), *cert. denied,* 359 U.S. 1000, 79 S.Ct. 1138, 3 L.Ed.2d 1030 (1959) (quoted with approval in *Hellenic Lines,* 398 U.S. at 309 n. 4, 90 S.Ct. at 1734 n. 4). However, this circuit and other courts have posed the inquiry as whether the United States had significant connections to the transaction compared to those of the foreign forums. *See, e.g., Lauritzen,* 345 U.S. at 582; *Phillips,* 632 F.2d at 86. *See generally* Carlson, *The Jones Act and Choice of Law,* 15 Int'l Law. 49, 52–55 (1981); Watson, *Applicable Law in Suits by Foreign Offshore Oil Workers,* 41 La.L.Rev. 827, 843–49 (1981).

7. Norexim argues that the relevant base of operations was Norway, because it maintained its headquarters there. However, "[w]e ... follow cases that have focused on the base of operations of the relevant business venture rather than of the corporate owner of the vessel." *Phillips,* 632 F.2d at 88. The center of the Gulf and Permal transactions was clearly New York, not Norway. Moreover, revenue for many of the Tento's past voyages was derived from United States ports. These circumstances fix the "base of operations of the relevant business venture" in the United States.

8. Norexim contends that its intention to have United States law apply as evidenced by its

clause in the charter party is irrelevant because "maritime liens arise separately and independently from the agreement of the parties, and rights of third persons cannot be affected by the intent of the parties to the contract...." *Rainbow Line,* 480 F.2d at 1026. In the *Rainbow* case, a charterer and a third party mortgagor claimed maritime liens against a vessel. If American law controlled, then the charterer would gain priority over the mortgagor. The charterer asserted that United States law should govern because it was so intended by the parties to the charter. The court ruled the charterer's intent was not decisive of the priority of its claim over a third party with which it had no agreement. The court was merely stating an obvious truism—nonparties cannot be bound by an agreement. But Norexim *was* party to the agreement in question. This does not necessarily mean that third parties can hold Norexim to an agreement to which they themselves cannot be held, but it shows that the choice of American law conforms to Norexim's original expectations.

