Maria Arlete VAZ BORRALHO, et al., Plaintiffs-Appellants,

v.

KEYDRIL COMPANY, Key International Drilling Company, Ltd. and Key Perfuracoes Maritimas, Ltda., Defendants-Appellees.

No. 81–2436.

United States Court of Appeals, Fifth Circuit.

July 25, 1983.

---

Benton Musslewhite, Robert A. Chaffin, Houston, Tex., for plaintiffs-appellants.

Ted C. Litton, Houston, Tex., for defendants-appellees.

## ON PETITION FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC

Before RUBIN, JOHNSON and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

The Petition for Rehearing is DENIED for the reasons set forth below, and because no member of this panel nor judge in regular active service on the Court has requested that the Court be polled on rehearing en banc, the Suggestion for Rehearing En Banc is DENIED.

In their Petition for Rehearing, appellants urge that our affirmance of the district court's choice of law determination improperly rested on our acceptance of its resolution of disputed factual issues. However, as we noted in our original opinion, even if the choice of law determination is to be made under standards similar to those applicable to motions for summary judgment, affirmance of the district court's ruling that American law was inapplicable would nonetheless be required on the basis of the primary facts about which there was no real dispute. 696 F.2d 379 at 388–89. We assumed, for purposes of our opinion,

that the KEY WEST's long-term, primary base of operations was American, as was its ultimate ownership and control and that of the other entities concerned. But these assumptions did not change, or obviate the significance of, the primary facts which were established without genuine dispute, as set out in our opinion, 696 F.2d at 387–89, including, for example, the fact that the formation and status of Borralho's employer as a Brazilian entity was required by the Brazilian national oil company as a condition of its chartering of the KEY WEST. As we observed in a similar connection in *Bailey v. Dolphin International, Inc.,* 697 F.2d 1268, 1276 n. 23 (5th Cir.1983), "... the *controlling* primary facts were essentially undisputed, the material questions being as to their legal significance." (Emphasis added.)

With respect to the issues addressed in our original opinion, we also call attention to the recent opinion of another panel of this Court in *De Oliveira v. Delta Marine Drilling Co.,* 707 F.2d 843 (5th Cir.1983).

Appellants also urge several contentions not addressed in our original opinion.

First, they point to the 1982 amendment to the Jones Act, which appellants say "codifies" the "rig cases doctrine" of the decisions in *Chiazor v. Transworld Drilling Company,* 648 F.2d 1015 (5th Cir.1981), *cert. denied,* 455 U.S. 1019, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982), and *Phillips v. Amoco Trinidad Oil Company,* 632 F.2d 82 (9th Cir.1980), *cert. denied sub nom. Romilly v. Amoco Trinidad Oil Company,* 451 U.S. 920, 101 S.Ct. 1999, 68 L.Ed.2d 312 (1981).[1] Appellants contend that this legislation demonstrates that Congress understood *Chiazor* and *Phillips* were incorrect determinations of existing law, for else why would Congress think it necessary to amend the statute, particularly with a savings clause (*see* note 1, *supra* ), to bring it into conformity with *Chiazor* and *Phillips.* We reject this contention.

The Jones Act was last previously amended in 1920, and it is extremely doubtful that any overlap in congressional membership existed between 1920 and 1982. Thus, while subsequent congressional actions "should not be rejected out of hand as a source that a court may consider in the search for legislative intent," nevertheless we feel this case is a particularly apt one in

1. The amendment was enacted December 29, 1982 by Pub.L. 97–389, Title V, § 503(a), 96 Stat. 1955. It redesignated the then-existing Jones Act, 46 U.S.C. § 688, as 46 U.S.C. § 688(a), and added a new subsection, codified as 46 U.S.C. § 688(b), as follows:
 "(b) Limitation for certain aliens; applicability in lieu of other remedy
 "(1) No action may be maintained under subsection (a) of this section or under any other maritime law of the United States for maintenance and cure for damages for the injury or death of a person who was not a citizen or permanent resident alien of the United States at the time of the incident giving rise to the action if the incident occurred—
 "(A) while that person was in the employ of an enterprise engaged in the exploration, development, or production of off-shore mineral or energy resources—including but not limited to drilling, mapping, surveying, diving, pipelaying, maintaining, repairing, constructing, or transporting supplies, equipment or personnel, but not including transporting those resources by (a) vessel constructed or adapted primarily to carry oil in bulk in the cargo spaces; and

 "(B) in the territorial waters or waters overlaying the continental shelf of a nation other than the United States, its territories, or possessions. As used in this paragraph, the term 'continental shelf' has the meaning stated in article I of the 1958 Convention on the Continental Shelf.
 "(2) The provisions of paragraph (1) of this subsection shall not be applicable if the person bringing the action establishes that no remedy was available to that person—
 "(A) under the laws of the nation asserting jurisdiction over the area in which the incident occurred; or
 "(B) under the laws of the nation in which, at the time of the incident, the person for whose injury or death a remedy is sought maintained citizenship or residency."
 This legislation also contained a "savings" clause, providing:
 "The amendment made by this section [section 503(a) of Pub.L. 97–389] does not apply to any action arising out of an incident that occurred before the date of enactment of this section." Sec. 503(b), Pub.L. 97–389.

which to apply the rule that such actions "must be weighed with extreme care" in light of the "sound admonition" that " 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.' " *Andrus v. Shell Oil Co.,* 446 U.S. 657, 666 n. 8, 100 S.Ct. 1932, 1938 n. 8, 64 L.Ed.2d 593 (1980). We observe that there is nothing in the *language* of the 1982 enactment, or in its legislative history, which indicates disapproval of the *Chiazor* and *Phillips* rationale, either on grounds of public policy or as being contrary to the legislative intent embodied in the Jones Act as it existed before 1982. Indeed, the indication is one of *approval.*

■ Why, then, the savings clause? The obvious inference is that Congress considered that existing law in this regard was unsettled and unclear, and did not wish its clarifying enactment to be absolutely binding on those whose injuries had already occurred, no matter how remote their chances for recovery might be. As we specifically noted in our original opinion, 696 F.2d at 389, the view expressed in certain decisions of the Second Circuit, indicating that ultimate American ownership and control of the relevant vessel alone sufficed to mandate application of American law, was rejected by the Third Circuit in *De Mateos v. Texaco, Inc.,* 562 F.2d 895, 902 n. 3 (3d Cir.1977), *cert. denied,* 435 U.S. 904, 98 S.Ct. 1449, 55 L.Ed.2d 494 (1978), and was inconsistent with *Chiazor* and *Phillips* (both of which cited *De Mateos* ), at least as applied to offshore drilling platforms at long-term, fixed locations in foreign territorial waters. All these decisions were rendered before 1982, and it is not illogical to assume that Congress was aware of them. We also observe that the 1982 amendment is somewhat broader than the rationale of *Chiazor,* which was to a significant extent grounded on the vessel's special nature and related relatively long-term, fixed location (in foreign territorial waters). The amendment, on the other hand, is not so limited, but instead seemingly applies on an industry-wide basis regardless of the type of vessel (except for those constructed or adapted primarily to carry oil in bulk in the cargo spaces) and regardless of whether any of the relevant operations are of a fixed or long-term nature.

■ The legislative history of the 1982 Jones Act amendment is somewhat sparse and confusing. Nonetheless, our review of it indicates to us that Congress regarded the existing decisional law in this area as unclear and unsettled, and further felt that, so far as some decisions might be thought to allow recovery in circumstances similar to those at bar, such decisions were *not* in accord with the original intent of the Jones Act.

The 1982 amendment came about as a part of H.R. 3942, 97th Cong., 2d Sess. (1982), known as the Fisheries Amendments of 1982. While H.R. 3942 largely dealt with other matters, its section 503 consisted of the Jones Act amendment. Section 503 was in turn borrowed without substantial change from H.R. 4863, 97th Cong., 2d Sess. (1982), as it emerged from the House Committee on Merchant Marine and Fisheries. Except for a United States citizen manning requirement applicable to certain United States offshore supply vessels bound for foreign territorial waters, H.R. 4863 was exclusively concerned with the Jones Act amendment. *See* 128 Cong.Rec.H. 7,631 (daily ed. Sept. 28, 1982).

The report of the House Committee on Merchant Marine and Fisheries respecting H.R. 4863 (H.R.Rep. No. 97–863, 97th Cong., 2d Sess., 1982), contains the following statement:

> "The courts have generally found that the substantive rights granted by the Jones Act do not extend to foreign nationals who lack sufficient contacts with the United States.... H.R. 4863 *codifies* this case law *and clarifies* that the substantive rights granted by the Jones Act do not extend to foreign offshore workers." [2] (*Id.* at 7; emphasis added.)

---

**2.** The following gives the full context of the quoted statements:

"The United States has entered into numerous treaties of friendship, commerce, and

When H.R. 4863 came to the floor of the House, the remarks of its sponsor there, Congressman Biaggi, included the following:

"In recent years, a substantial number of foreign offshore workers—injured while working in waters under the jurisdiction of a foreign nation—have commenced lawsuits against U.S. companies in our courts based on the theory that they are seamen covered under the Jones Act and other maritime laws.

"*Most court decisions have held that a foreign offshore worker injured on a foreign Continental Shelf should not bring his action in a U.S. court*—unless he lacks a remedy in the host nation or his home nation. *H.R. 4863 will codify this judicial precedent.*

"I emphasize that this legislation does not usurp a legitimate court perogative. But, rather, *it codifies the precedents already established* by the courts." 128 Cong.Rec.H. 7,632 (daily ed. Sept. 28, 1982) (emphasis added).

Congressman Snyder, the next to speak in favor of H.R. 4863, stated, *inter alia:*

"In recent years there has been a substantial number of cases instituted in the United States involving injuries sustained in foreign waters which appear to have little or no relationship with the United States. However, some courts have held

that mere U.S. corporate ownership of a drilling activity may be enough to permit a lawsuit by a foreign seaman to proceed. Consequently, *there has been an uncertain and confusing case law development regarding the offshore industry.* H.R. 4863 is an attempt to establish a uniform approach to considering suits brought by foreign workers injured over the Outer Continental Shelf of a foreign nation." *Id.* (emphasis added).

Thereafter, the provisions of H.R. 4863 dealing with the Jones Act (sections 1 and 2 of H.R. 4863) were incorporated, without substantial change, into H.R. 3942, as its section 503. *See* 128 Cong.Rec.H. 9,449–51 (daily ed. Dec. 10, 1982). Speaking in favor of H.R. 3942, Congressman Pritchard addressed the Jones Act amendment, stating "[s]ection 503 substantially incorporates the provisions of H.R. 4863," and continuing by repeating Congressman Snyder's above-quoted remarks concerning the "uncertain and confusing case law." 128 Cong.Rec.H. 9,453 (daily ed. Dec. 10, 1982). On the same day in the Senate, Senator Long supported H.R. 3942, observing that laws such as the Jones Act "were never intended to apply to foreign workers engaged in offshore operations abroad," and on three occasions referring to section 503 as being "a clarification" or intended "to clarify" existing law.[3]

navigation with other nations. These treaties generally include 'access' provisions assuring that foreign nationals will have 'free and open access to the courts' of the United States. The Supreme Court has found that, while this type of provision grants procedural rights, it 'does not define substantive rights but leaves them to be ascertained by the law governing the courts and administered and enforced in them.' *Majorano [Maiorano] v. Baltimore and Ohio Railroad,* 213 U.S. 268 [29 S.Ct. 424, 53 L.Ed. 792]. The courts have generally found that the substantive rights granted by the Jones Act do not extend to foreign nationals who lack sufficient contacts with the United States. These court decisions are not a denial of equal access but rather a determination of lack of standing. The decisions generally hold that the litigant has no right which can be enforced in a U.S. court. H.R. 4863 codifies this case law and clarifies that the substantive rights granted

by the Jones Act do not extend to foreign offshore workers.

"The legislation is in accord with customary international law and international agreements in that it recognizes the rights of a nation to regulate activity within its territorial waters and in the Outer Continental Shelf adjacent to the coast of that nation. The present situation whereby domestic United States law is applied to actions and occurrences within the jurisdiction of a sovereign foreign nation is an unwarranted application and extraterritorial extension of U.S. law and not in accord with our treaties of friendship and navigation." *Id.* at 7.

**3.** Senator Long's remarks in this regard, appearing at 128 Cong.Rec.S. 14,364 (daily ed. Dec. 10, 1982), include the following:

"MR. LONG: Mr. President, American offshore service companies and their foreign subsidiaries are being severely impacted by a multitude of lawsuits, aggregating claims

■ In sum, we are not persuaded by appellants' arguments based on the 1982 Jones Act amendment. The text of the amendment simply does not speak to the issue before us. The legislative history indicates that some in Congress viewed the amendment as a codification of existing law, while others viewed the current "case law" as "uncertain and confusing" and in need of "clarification." To the extent that there was recognition of the possibility that *some* court decisions might appear to authorize recovery in circumstances like the present, such decisions were not viewed either as being congruent with the original intent of the Jones Act or as reflecting a consistent and settled judicial interpretation of it. Congress spoke to the future to *insure* that what it had thought was the proper interpretation of the Jones Act would henceforth apply, and, rather than run any risk of acting retroactively, left it to the courts to work out the situation with regard to previous injuries.

■ Appellants' next claim that the decision herein violates their rights under the Treaty of 1828 between the United States and Brazil. 5 Treaties and Other International Agreements of the United States of America 1776–1949, at 792–803 (1970).[4] We

over a billion dollars, brought by foreign offshore oil and gasfield workers. These lawsuits for damages arising from foreign offshore personal injury claims are based upon U.S. maritime tort laws enacted 40 to 50 years before worldwide offshore mineral extraction activities began. *Such laws were never intended to apply to foreign workers engaged in offshore operations abroad.*

" . . . .

"A reasonable *solution is to clarify U.S. maritime tort laws* to provide that a foreign worker engaged in mineral extraction activities in waters over the continental shelf of a foreign nation may not seek a remedy for his work-related injury in U.S. courts if he has a remedy in his home country, or in the country with jurisdiction over the accident site, if different. Should there be no remedy overseas, the foreign worker would then, and only then, be able to adjudicate his claim in U.S. courts.

"*Such a clarification* would not affect U.S. workers no matter where in the world they work, or seamen on blue-water vessels, or anyone working in waters over the U.S. Continental Shelf.

"*This statutory clarification* is needed in order to *insure* that U.S. offshore service companies remain competitive enough to continue to provide U.S. citizens jobs both at home and abroad." (Emphasis added.)

4. Of the Treaty's twenty-three articles, those which appear to come the closest to having any potential relevance to the present question are Articles VI and XII, which provide:

"ARTICLE VI.

"It is likewise agreed, that it shall be wholly free for all merchants, commanders of ships, and other citizens or subjects of both countries, to manage themselves their own business, in all ports and places subject to the jurisdiction of each other, as well with respect to the consignment and sale of their goods and merchandize by wholesale or retail, as with respect to the loading, unloading and sending off their ships; they being in all these cases to be treated as citizens or subjects of the country in which they reside, or at least to be placed on a footing with the subjects or citizens of the most favored nation.

" . . . .

All merchants, &c. placed on the most favored footing.

"ARTICLE XII.

"Both the contracting parties promise and engage formally to give their special protection to the persons and property of the citizens and subjects of each other, of all occupations, who may be in their territories, subject to the jurisdiction of the one or the other, transient or dwelling therein, leaving open and free to them the tribunals of justice for their judicial intercourse, on the same terms which are usual and customary, with the natives or citizens and subjects of the country in which they may be; for which they may employ, in defence of their rights, such advocates, solicitors, notaries, agents, and factors, as they may judge proper in all their trials at law."

Special protection to persons and property.

have considerable doubt that this treaty was intended to require the application of American, in preference to Brazilian, law to a suit by a Brazilian citizen and resident for a tort occurring in Brazilian territorial waters in the course of Brazilian employment. Moreover, we observe that the House Committee Report on H.R. 4863 concluded that the Jones Act amendment, which would likewise preclude application of American law in suits such as the present, was in accord with this country's numerous treaties of friendship, commerce, and navigation with other nations. *See* note 2, *supra*.[5] We need not definitely determine these questions, however, for appellants never raised any claims concerning this or any other treaty with Brazil either in the court below or in this Court before filing their Petition for Rehearing. We see no reason to make an exception in this case to the general rule that we will not reverse a trial court on the basis of a contention raised for the first time on Petition for Rehearing in this Court.

Appellants finally urge that under the Brazilian conflicts of law doctrine, Brazilian courts would apply American law to this suit, because it is more favorable to the injured workman than Brazilian law.[6] They argue that if we refer to Brazilian law to decide this case, then we must refer not only to Brazilian local law rules, but also to Brazilian choice of law rules. This contention seems dubious, at the very best. Neither the district court nor this Court purported to decide this case on the basis of Brazilian law. Moreover, there is respected authority that reference to the conflicts of law rules of nonforum states is normally limited to a few restricted classes of cases, none like that at bar, and in any event should not be applied where the other state's conflict of law rule refers back to the local law of the forum. *See Restatement (Second) of Conflict of Laws* § 8 and comments a., b., and j. (last paragraph) (1971). And, we doubt that Brazil would hold American law, particularly statutory law, applicable to a class of case that American courts held it did not apply to, or that the courts of this nation would apply the Jones Act or the Death on the High Seas Act to cases to which they were otherwise inapplicable merely because of the conflicts of law rules prevalent in a particular foreign jurisdiction where the accident occurred. We need not decide these issues, however. Appellants' suit was not founded to any extent on Brazilian law, "local" or "conflicts," and appellants made no allegation or proof below of the Brazilian conflict of law rules. We will not reverse the district court on the basis of this contention as it was not raised below or in this Court prior to Petition for Rehearing.

**5.** The State Department in June 1982 advised that it "cannot support" the then-pending H.R. 4863 because the bill "could ... give rise to claims by U.S. Treaty partners that the United States is not providing the national treatment in terms of access to U.S. courts generally required by our treaties of friendship, commerce, and navigation." *See* H.R.Rep. 97–863, *supra*, at 13–14. However, Congress, despite this advice, concluded otherwise (*see* note 2, *supra*), and passed the Jones Act amendment. The Executive Department apparently changed its mind, as the bill was signed by the President. Moreover, as we have noted, the 1982 Jones Act amendment is somewhat broader than either *Chiazor* or our decision in the present case, and we have no indication whether the State Department's June 1982 views would be applicable to a case such as this.

**6.** Appellants attach to their Petition for Rehearing an affidavit of a Brazilian attorney stating that under Brazilian law "cases of injuries or death of laborers, occured [*sic*] in Brazil, can be decided in brazilian [*sic*] courts, in accordance with the most favorable law to the employee, either the law of the place of performance of the work or the law of the main site of the employer ... [s]o it is up to the employee to bring proof to court that the law of the main site of the employer is more favorable to him and request the application of this law." Except as reflected by the above quotation, the affidavit does not purport to speak to any particular type of case, nor to the facts of this or a similar case; *it does not address the situation* where the law of the employer's alleged "main site" which is sought to be applied is the law of a foreign nation the courts of which have held that the law in question does not apply to this class of case; and it contains no indication that American law would be viewed as more favorable than Brazilian in this or any other circumstance.

Appellants' Petition for Rehearing and Suggestion for Rehearing En Banc are denied. No further motion for rehearing will be entertained.

DENIED.