**In re OCEAN RANGER SINKING OFF NEWFOUNDLAND ON FEBRUARY 15, 1982.**

**MDL Docket No. 508.**

United States District Court, E.D. Louisiana.

June 5, 1984.

cretion declines to assess interest on the sums owed.

John J. Cummings, III, New Orleans, La., liaison counsel; G. Robert Friedman, Houston, Tex., plaintiffs' steering committee chairman; John J. Cummings, III, New Orleans, La., Charles F. Krause, New York City, plaintiffs' steering committee; G. Robert Friedman, Houston, Tex., plaintiffs' committee chairman; Leo Barry, Q.C., St. John's, Newfoundland, Canada, Will Boudreaux, New Orleans, La., Robert Chaffin, Houston, Tex., John J. Cummings, III, New Orleans, La., Wendell H. Gauthier, Kenner, La., James George, Baton Rouge, La., Charles F. Krause, New York City, Charles Lipcon, Miami, Fla., Stephen B. Murray, New Orleans, La., Benton Musslewhite, Houston, Tex., Gerry O'Brien, St. John's, Newfoundland, Canada, Michael A. Walker, Charleston, S.C., plaintiffs' committee.

Gilbert T. Adams, Jr., Beaumont, Tex., James T. Adams, Shreveport, La., Baird, Carter & Parker by David Baird, St. John's, Newfoundland, Canada, Barker, Boudreaux, Lamy, Gardner & Foley by Wilfred H. Boudreaux, Harold J. Lamy, New Orleans, La., Barry & Smyth, St. John's, Newfoundland, Canada, John T. Bennett, Marksville, La., Blaney, Pasternak, Smela & Wilson, Toronto, Ontario, Canada, John A. Burgess, Berkeley, Cal., Raymond C. Caballero, El Paso, Tex., Cummings & Gambel by John J. Cummings, III, New Orleans, La., Faber & Gurevitch by Judith Turnbull, Calgary, Alberta, Canada, French & Roil by John R. Roil, St. John's, Newfoundland, Canada, Friedman & Chaffin by

Robert Chaffin, G. Robert Friedman, Houston, Tex., Wendell Gauthier, Kenner, La., George & George by James A. George, Baton Rouge, La., Goff & Goff by A. Kennon Goff, III, Ruston, La., Sam N. Gregorio, Shreveport, La., Charles L. Guest, Hattiesburg, Miss., Frank E. Haddad, Jr., Louisville, Ky., Halley, Hunt by Leo Barry, Q.C., St. John's, Newfoundland, Canada, S. Robert Hammond, Jr., Hattiesburg, Miss., Bert L. Huebner, Bay City, Tex., Hyde, Pollit & Arnold by Henry Pollit, Toronto, Ontario, Canada, Kierr, Gainsburgh, Benjamin, Fallon & Lewis by Eldon E. Fallon, Judith A. Gainsburgh, New Orleans, La., Kreindler & Kreindler by Paul S. Edelman, New York City, Lacroix & McKeithen by Leslie L. Lacroix, Jr., Bruce B. McKeithen, Monroe, La., Frank E. Lamothe, III, New Orleans, La., James Lee, Marksville, La., Lewis, Day, Cook, Sheppard & Eaton, St. John's, Newfoundland, Canada, Charles A. Lipcon, Miami, Fla., Marshall, White, Ottenhelmer & Green, St. John's, Newfoundland, Canada, Toby McDonald, St. John's, Newfoundland, Canada, John Wilfred McGrath, St. John's, Newfoundland, Canada, Monigan, Seaborn, Marshall & Roberts by Michael J. Minigan, St. John's, Newfoundland, Canada, Moores, Finn & Andrews by A. Douglas Moore, Bay Roberts, Newfoundland, Canada, Murray, Murray, Ellis, Braden & Landry, Benton Musslewhite, Houston, Tex., Noonan & Chalker, St. John's, Newfoundland, Canada, James E. Nurse, Q.C., St. John's, Newfoundland, Canada, O'Brien, Hurley & Coffey by Gerry O'Brien, St. John's, Newfoundland, Canada, O'Dea, Greene by Diane Fraser, St. John's, Newfoundland, Canada, O'Quinn & Hagans by John O'Quinn, Houston, Tex., David Ryan, Hartford, Conn., George T. Sink, Charleston, S.C., Speiser & Krause by Ana Arango, Charles F. Krause, New York City, Strong, Andrews & O'Dea, St. John's, Newfoundland, Canada, J. Robert Sullivan, Laurel, Miss., Michael Walker, Charleston, S.C., Wells, O'Dea, Halley, Earle, Shortall & Burke, St. John's, Newfoundland, Canada, White, Jones & Lombard by Charles H. White, New Orleans, La., for plaintiffs.

Lemle, Kelleher, Kohlmeyer & Mathews by George A. Frilot, III, Rebecca J. Kennedy, Michael A. McGlone, James F. Shuey, Hal C. Welch, New Orleans, La., for Ocean Drilling & Exploration Co., ODECO International Corp., ODECO Engineers, Inc., and ODECO Drilling of Canada; Royston, Rayzor, Vickery & Williams by Ben L. Reynolds, Houston, Tex., for ODECO International Corp., ODECO Engineers, Inc., and ODECO Drilling of Canada, Ltd.; Brown & Hines by George W. Brown, Jr., Earl S. Hines, Beaumont, Tex., for Ocean Drilling & Exploration Co.

Liskow & Lewis by Donald R. Abaunza, Robert W. Booksh, Jr., S. Gene Fendler, William W. Pugh, Bruce V. Schewe, New Orleans, La., for Mobil Oil Corp. and Mobil Oil Canada, Ltd.; Bingham, Englar, Jones & Houston by William P. Kardaras, New York City, Donald W. McFarlane, Calgary, Alberta, Canada, McGinnis, Holmes & Adams by Bryan J. McGinnis, Beaumont, Tex., Vinson & Elkins by Eugene J. Silva, Houston, Tex., for Mobil Oil Canada, Ltd.

Raymond F. Bossmeyer, Louisville, Ky., Buist, Moore, Smythe & McGee by Pledger M. Bishop, Jr., Charleston, S.C., Jones, Walker, Waechter, Poitevant, Carrere & Denegre by Robert B. Acomb, Jr., Edith B. Clement, John R. Peters, Jr., James E. Wright, III, New Orleans, La., Miller & Miller by Scott Miller, Jr., Stephanie Miller, Louisville, Ky., for Mitsubishi Heavy Industries, Ltd.

Brown, Sledd & McCann by William McCann, Lexington, Ky., Chaffe, McCall, Phillips, Toler & Sarpy by J. Dwight LeBlanc, Jr., Robert H. Murphy, E. Carroll Rogers, New Orleans, La., Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy by Raymond P. Hayden, New York City, McKay & McKay by R. Howard Grubbs, Douglas McKay, Jr., J. Douglas Nunn, Jr., Columbia, S.C., for Mitsubishi Intern. Corp.

Hammett, Leake & Hammett by Joseph G. Gallagher, Jr., Eldon T. Harvey, III, New Orleans, La., for Watercraft America, Inc.

Deutsch, Kerrigan & Stiles by Cornelius G. Van Dalen, G. Alex Weller, New Orleans, La., for Harding, A/S.

Hanemann & Little by James Hanemann, Jr., Edward S. Johnson, New Orleans, La., Kirlin, Campbell & Keating by Thomas Coyne, William O'Brien, New York City, for American Bureau of Shipping, Inc.

John Volz, U.S. Atty., New Orleans, La., William F. Baity, Asst. U.S. Atty., New Orleans, La., Thomas L. Jones, Richard K. Willard, Senior Admiralty Counsel, Torts Branch, Civil Division, Dept. of Justice, Washington, D.C., for the United States.

## REASONS

ROBERT F. COLLINS, District Judge.

These consolidated actions arise from the sinking of the OCEAN RANGER on February 15, 1982, off the coast of Newfoundland, Canada. The entire 84-man crew was lost and presumed dead. At the time of its commissioning in 1976, the OCEAN RANGER was the largest semisubmersible drilling rig in the world, one that was designed, constructed, and thereafter utilized to drill offshore oil wells.

The claimants in these consolidated actions are primarily the survivors, dependents, and representatives of the lost crew. The actions are brought under the Jones Act, 46 U.S.C. § 688, the Death on the High Seas Act (DOHSA), 46 U.S.C. §§ 761, *et seq.*, the Suits in Admiralty Act, 46 U.S.C. §§ 741, *et seq.*, the general maritime law of the United States, and, in some cases, state tort law. Of the eighty-three actions filed, sixty-nine resulted from the deaths of Canadian crewmembers and fourteen resulted from the deaths of American crewmembers.[1] Of the sixty-nine actions filed as a result of Canadian deaths, fifty-seven were originally filed in the Eastern District of Texas, eleven in this district, and one in the Southern District of Texas. Of the fourteen claims filed as a result of American deaths, ten were originally filed in this district, one in the Eastern District of Texas, one in the Southern District of Texas, one in the District of South Carolina, and one in the Western District of Kentucky.

The defendants in most or all of the actions are Ocean Drilling and Exploration Company (ODECO), ODECO International Corporation (ODECO International), ODECO Engineers, Inc. (ODECO Engineers), ODECO Drilling of Canada (ODECO Canada), Mobil Oil Corporation (Mobil), Mobil Oil Canada, Ltd. (MOCAN), the United States of America, the American Bureau of Shipping (ABS), and Mitsubishi Heavy Industries, Ltd. (MHI).[2] ODECO, ODECO International, and ODECO Engineers are all incorporated in Delaware with their principle place of business in Louisiana. ODECO is the parent corporation, which is engaged world-wide in the offshore oil exploration industry. ODECO International, a wholly owned corporate subsidiary of ODE-

1. The figures given, both in terms of the total number of actions filed and the breakdown according to nationality of the decedent connected with each action, are merely approximations for several reasons. First, the nationality of a plaintiff's decedent is not always determinable from the face of the complaint. For example, a number of documents filed with the Court indicate that one of the decedents was from Great Britain, but the Court has been unable to confirm that fact from an analysis of the pleadings. Second, more than one action has been brought on behalf of some of the individual decedents. In one instance, this appears to be the result of successive spouses bringing separate actions for the same death. In two instances, two separate actions were brought against different defendants but by the same plaintiff and on behalf of the same decedent. In three instances, separate but identical actions were filed in state and federal courts, the federal actions were transferred here by the Judicial Panel on Multidistrict Litigation, and the state actions were subsequently removed and then transferred here. Third, a large number of actions have settled as to some, but not all, defendants. However, only one action has been completely settled. Finally, new actions are still being initiated.

2. In addition, Mitsubishi International Corporation was originally named as a defendant in two actions, the one originally filed in the District of South Carolina and the one originally filed in the Western District of Kentucky. However, plaintiffs in those two actions have voluntarily dismissed their claims against Mitsubishi International Corporation.

CO, was the registered owner of the OCEAN RANGER at the time of its sinking. ODECO Engineers, another wholly owned corporate subsidiary of ODECO, designed the OCEAN RANGER. At all pertinent times, the OCEAN RANGER was operated by ODECO Canada, a wholly owned Canadian corporate subsidiary of ODECO, pursuant to a bareboat charter from ODECO International. The OCEAN RANGER was operating under a drilling contract between ODECO Canada and MOCAN, which is a wholly owned Canadian corporate subsidiary of Mobil, a Delaware corporation with its principal place of business in New York. The OCEAN RANGER was constructed in Japan by MHI, a Japanese corporation. The OCEAN RANGER was inspected by the ABS and the United States of America (through the Coast Guard).

On July 19, 1982, and on several subsequent dates, the Judicial Panel on Multidistrict Litigation (JPMDL) ordered that a number of these actions be transferred to this Court and consolidated for purposes of pretrial proceedings. Pursuant to the orders of this Court, a timetable was established for filing and briefing the anticipated jurisdictional motions. Extensive discovery has been allowed pertaining to the jurisdictional issues raised.[3]

Surfacing from the voluminous documents, exhibits, and memoranda, is a jurisdictional controversy that involves two major issues and an intertwined flotilla of related minor issues. The first major issue is whether each defendant has a sufficient nexus with the various forum states to satisfy all requisites for each forum state's exercise of *in personam* jurisdiction over that defendant. The second major issue, assuming that the forum state's exercise of *in personam* jurisdiction is permissible, is whether the Court should exercise its discretion, after determining the applicable body of law and weighing the private interests of the litigants and the public interests of the fora, to dismiss these actions on grounds of *forum non conveniens*.

## I. In Personam Jurisdiction

■ This Court's analysis of *in personam* jurisdiction is based on a consideration of that concept's two essential elements: (1) amenability to jurisdiction, which refers to the substantive reach of a forum's jurisdiction; and (2) service of process, which refers to the physical means by which jurisdiction is asserted. This Court is authorized to adjudicate the rights of the parties only if both of these related but distinct elements are properly present.

■ The Court finds that, despite the arguments of all parties herein to the contrary, the amenability to jurisdiction of non-resident parties in the present actions is governed by the federal due process standard enunciated in *International Shoe*

---

**3.** Thus, plaintiffs' contentions that a decision on the choice of law issue should be treated as a motion for summary judgment, should await further developments at trial on the merits, and, if factual disputes exist, should be decided by a jury are clearly without substance. A motion based on *forum non conveniens* is ordinarily brought and decided by the Court before trial on the merits. To hold otherwise would cause delay, create confusion, and defeat the very purpose of the doctrine of *forum non conveniens*, which is to decline to adjudicate a matter when public and private interests, such as imposing the burden of adjudication (jury duty) on members of a community with little or on connection with the litigation, favor another forum. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–09, 67 S.Ct. 839, 843–44, 91 L.Ed. 1055 (1947). In addition, the plaintiffs' argument that the choice of law issue should be presented to the jury, thereby deferring a *forum non conveniens*

determination until trial on the merits, would effectively establish the governing law as the controlling or crucial factor in deciding whether or not to decline to exercise jurisdiction, despite the Supreme Court's determination that the governing law is but one of many factors pertaining to the issue of *forum non conveniens*. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). Finally, because of the extensive discovery conducted in connection with these jurisdictional motions, the factual basis underlying the Court's choice of law determination is largely uncontested. *But see infra* nn. 17 & 18. Rather, it is the weight and interpretation to be accorded these facts that form the basis of any dispute on this issue. Accordingly, this Court, like so many in the past, will proceed to determine the applicable law in these actions, rather than defer to the jury on the choice of law issue.

*v. Washington*, 326 U.S. 310, 316, 318, 66 S.Ct. 154, 158, 159, 90 L.Ed. 95 (1945), rather than a state standard, because these actions arise under federal question and maritime jurisdiction, rather than solely under diversity jurisdiction.[4] *See Terry v. Raymond International, Inc.*, 658 F.2d 398, 402–03 (5th Cir.1981), *reh'g denied*, 667 F.2d 92 (5th Cir.1982), *cert. denied*, 456 U.S. 928, 102 S.Ct. 1975, 72 L.Ed.2d 443 (1982); *Lone Star Package Car Co. v. Baltimore and O.R.R.*, 212 F.2d 147, 153–55 (5th Cir.1954). The Court also finds that, in the present actions, service of process is governed by federal standards, and, under Fed.R.Civ.P. 4, "either federal or state methods of service [of process] are authorized." *Terry v. Raymond International Inc.*, 658 F.2d at 401.

■ In *International Shoe* and its progeny,[5] the Supreme Court established the due process limitations on a forum's ability to assert *in personam* jurisdiction over a nonresident defendant. Constitutionally permissible amenability to jurisdiction depends on the nonresident defendant's activities within the forum state being of such quality and nature that it is fair and reasonable to require the nonresident to defend the action in that forum.

The *International Shoe* decision established two standards for determining when a forum state may constitutionally exercise *in personam* jurisdiction over a nonresident defendant. The first standard is the "minimum contacts" standard, and the second standard is the "substantial, continuous, and systematic activities" standard.

■ The minimum contacts standard of *International Shoe* requires a two-step analysis. Under the first step, the facts of

the case must be analyzed to determine if the defendant has sufficient contacts with the forum state to justify that forum's exercise of *in personam* jurisdiction over the defendant. It is important to note that, under the minimum contacts standard, the defendant's contacts with the forum state must have given rise, or be related, to the particular cause of action asserted. If the defendant has not had sufficient related contacts, then the forum state cannot exercise *in personam* jurisdiction. If the defendant has had sufficient contacts with the forum state, then the Court must take the second step and determine whether the exercise of jurisdiction would " 'offend traditional notions of fair play and substantial justice.' " *International Shoe*, 326 U.S. at 316, 66 S.Ct. at 158 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)). The forum state can constitutionally exercise jurisdiction only if the Court determines that the exercise of jurisdiction is not unfair or unjust.

■ The second standard established by *International Shoe*, the "substantial, continuous, and systematic activities" standard, provides, unlike the minimum contacts standard, a basis for obtaining jurisdiction over a nonresident defendant as to claims that are *unrelated* to the defendant's forum state contacts. In establishing this second standard, the Court noted that "there have been instances in which the continuous corporate operations within a state were thought so substantial and of such a nature as to justify suit against [the corporation] on causes of action arising from dealings entirely distinct from those activities." *International Shoe*, 326 U.S. at 318, 66 S.Ct. at 159. *See Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952).

---

**4.** Two of these actions, the ones originally filed in South Carolina and Kentucky, initially asserted only diversity jurisdiction. However, the complaints in these actions were amended, on October 13, 1983, to include claims based on federal question and maritime jurisdiction. Thus, the ruling in *Terry* is applicable to those actions as well.

**5.** *See, e.g., Helicopteros Nacionales de Colombia, S.A. v. Hall,* —— U.S. ——, 104 S.Ct. 1868, 80

L.Ed.2d 404 (1984); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Kulko v. Superior Court,* 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978); *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *McGee v. International Life Insurance Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); *Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952).

*But see Helicopteros Nacionales de Colombia, S.A. v. Hall,* —— U.S. ——, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). In other words, it is fair to require a corporation engaging in substantial, continuous, and systematic activities in the forum state to defend an action there, even if the claim arose in another state.

Since the present actions were originally filed in various states and consolidated herein through the medium of the JPMDL, the Court must determine if each forum state had *in personam* jurisdiction over each nonresident defendant sued in actions originally filed in that state. It is therefore necessary to categorize and analyze the claims according to forum and defendant: the ODECO defendants and MOCAN contest *in personam* jurisdiction in those actions originally filed in Texas; [6] MOCAN and MHI contest *in personam* jurisdiction in Louisiana.[7]

### A. *Texas Actions*

#### 1. *ODECO Defendants*

▉ The Texas claimants contend and the Court finds that ODECO, the parent corporation, engages in substantial, continuous, and systematic business activities in Texas, and, therefore, is constitutionally amenable to jurisdiction. Alternatively, the Court finds that ODECO is constitutionally amenable to jurisdiction under the minimum contacts standard. Much of ODECO's business activities in Texas involves the purchase of millions of dollars worth of offshore drilling equipment over the course of many years. ODECO purchased thousands of dollars worth of offshore drilling equipment and parts in Texas for use on the OCEAN RANGER itself. In addition, ODECO has participated in and made purchases at State of Texas mineral lease sales,[8] and, since some of these purchases include tracts in Texas territorial waters, it is also likely that ODECO rigs have been operating in Texas territorial waters. In addition, ODECO solicited bids in Houston, Texas for the original construction of the OCEAN RANGER, and advertised in Texas for OCEAN RANGER crewmember positions. Moreover, ODECO sent specifications and drawings for construction of the OCEAN RANGER to Mitsubishi

---

**6.** Initially, MHI was not named as a defendant in those actions originally filed in Texas. However, on August 9, 1983, the fifty-seven Canadian actions and the sole American action originally filed in the Eastern District of Texas amended their complaints by, *inter alia,* adding MHI as a defendant. Subsequently, on August 26, 1983 and again on October 27, 1983, MHI reurged all of its motions, including its motion to dismiss for lack of personal jurisdiction. Thus, pursuant to the Court's Order of September 14, 1983, MHI has effectively objected to personal jurisdiction in Texas. To date, plaintiffs have filed nothing in support of their contention that personal jurisdiction over MHI exists in Texas. Thus, the Court will defer ruling on this motion until plaintiffs have had an opportunity to respond. However, in light of the Court's choice of law and *forum non conveniens* determinations, it will only be necessary for the plaintiffs in those actions remaining before the Court to respond.

**7.** MHI also contested *in personam* jurisdiction in the two actions originally filed in South Carolina and Kentucky. However, the plaintiffs in those actions have now voluntarily dismissed their claims against MHI.

The Court notes that MHI has also moved to dismiss four of the actions filed in Louisiana as a result of the deaths of Canadian crewmen, for lack of subject matter jurisdiction. MHI contends that subject matter jurisdiction is lacking, because plaintiffs allege diversity of citizenship as their sole jurisdictional basis and there is no diversity jurisdiction as between foreign plaintiffs and foreign defendants. While MHI is correct that plaintiffs incorrectly allege diversity of citizenship as their jurisdictional basis, further perusal of these plaintiffs' complaints reveals that a cause of action is alleged against MHI under the general maritime law. *See, e.g.,* the complaint of plaintiff, Irmgard Halliday, entitled *Seaman's Suit Pursuant to the Merchant Marine Act, General Maritime Law, Suits in Admiralty* at *Second Cause of Action* and *Third Cause of Action.* The Court will not penalize these plaintiffs for their failure to adhere strictly to the general rules of pleading, set forth in Fed.R.Civ.P. 8(a), because their reliance on multiple jurisdictional bases is evident from the body of the pleading itself and gives MHI sufficient notice thereof.

**8.** *See* Exhibit 10 attached to Deposition of Tucker H. Couvillon, III (ODECO 1977 Annual Report at 11–12, and ODECO 1978 Annual Report at 12).

International Corporation's Houston office for forwarding to MHI in Japan. Finally, ODECO has appointed C.T. Corporation as its resident agent in Texas for receiving service of process. Thus, it is clear that ODECO's contacts with Texas are not merely fortuitous, but rather, ODECO is purposefully availing itself of the business and wealth of Texas and is enjoying the potential benefits and protection of Texas law. Under these circumstances, the Court simply cannot conclude that it would be unfair or unjust to require ODECO to defend these suits in Texas.

■ The Court also finds that process has been properly served on ODECO. Service of process was perfected on ODECO, pursuant to Fed.R.Civ.P. 4 and Tex.Rev. Civ.Stat.Ann. art. 2031b, via ODECO's designated resident agent physically located in Texas.[9]

■ With respect to ODECO International, ODECO Engineers, and ODECO Canada, the plaintiffs contend that *in personam* jurisdiction over ODECO, the parent corporation, also confers jurisdiction over these ODECO subsidiaries, because the subsidiaries are so extensively controlled and dominated by ODECO as to be the mere instrumentalities or alter egos of the parent corporation, and because the subsidiaries have vicariously engaged in substantial business in Texas through ODECO acting as their purchasing agent. Thus, plaintiffs are asserting that *in personam* jurisdiction exists as to these ODECO subsidiaries under both of the most widely applied theories employed by courts today in determining when to impute the business activities of one corporate entity to a related corporate entity for jurisdictional purposes. These two theories are the so-called "control" theory and the so-called "agency" theory.[10] Under the con-

9. ODECO has also moved to dismiss the Texas actions on grounds of improper venue. Plaintiffs, in support of their contention that venue is proper in the Eastern District of Texas, rely solely on *Davis v. Hill Engineering, Inc.,* 549 F.2d 314 (5th Cir.1977), as authority for the proposition that "a corporation may be sued in any district of a state in which it does business." *Plaintiffs' Proposed Findings of Fact, Conclusions of Law and Post-Argument Memorandum of Law in Opposition to Motions of ODECO, Mobil and Mitsubishi Heavy Industries to Dismiss for Improper Service of Process, Lack of Personal Jurisdiction and Forum Non Conveniens* at 6. However, *Davis* does not stand for the proposition asserted by plaintiffs, but rather for the proposition that a corporation may be sued in any district of a state in which it is *incorporated.* Thus, *Davis* is inapplicable here, because ODECO is incorporated in Louisiana, not Texas. Since plaintiffs rely solely on *Davis,* and since *Davis* is inapplicable, plaintiffs have not shown that venue is proper in the Eastern District of Texas. The Court will defer ruling on this motion until plaintiffs, in those actions remaining before this Court, have had an opportunity to argue that venue is proper in the Eastern District of Texas on some other grounds, or to argue that this Court should transfer such actions to this district, pursuant to Rule 11(b) of the Rules of Procedure of the JPMDL.

10. Both theories appear to be the result of varying judicial interpretations of the Supreme Court's decision in *Cannon Manufacturing Co. v. Cudahy Packing Co.,* 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925). Specifically, both theories

appear to have evolved from a portion of the *Cannon* opinion that described the relationship between the subject parent and subsidiary corporations as follows:

The [subsidiary] corporation, which has an office in [the forum state], is the instrumentality employed to market [the parent corporation's] products within the state; but it does not do so as [the parent corporation's] agent.... Through ownership of the entire capital stock and otherwise, the [parent corporation] dominates the [subsidiary] corporation, immediately and completely, and exerts its control both commercially and financially in substantially the same way, and mainly through the same individuals, as it does over those selling branches or departments of its business not separately incorporated which are established to market the [parent corporation's] products in other states. The existence of the [subsidiary] company as a distinct corporate entity is, however, in all respects observed. Its books are kept separate. All transactions between the two corporations are represented by appropriate entries in their respective books in the same way as if the two were wholly independent corporations.

*Cannon,* 267 U.S. at 335, 45 S.Ct. at 251. Based on that characterization of the parent/subsidiary relationship, the Court held that *in personam* jurisdiction over the wholly owned, but distinctly operated, subsidiary corporation did not also confer *in personam* jurisdiction over the parent corporation. Since *Cannon,* most courts have analyzed the extent of corporate control exercised by the parent

trol theory, plaintiffs must make a *prima facie* showing that the relationship between ODECO and these subsidiaries "is one which would allow the court to find that the doing of business of the parent corporation can be imputed to the subsidiary." *Walker v. Newgent,* 583 F.2d 163, 167 (5th Cir.1978). Under the agency theory, plaintiffs must make a *prima facie* showing that ODECO acted in Texas "with either actual or apparent authority on behalf of the others." *Product Promotions, Inc. v. Cousteau,* 495 F.2d 483, 493 (5th Cir.1974).

The Court finds that a *prima facie* showing has been made that ODECO International, ODECO Engineers, and ODECO Canada are so extensively controlled by ODECO that they are mere instrumentalities of the parent corporation, and, therefore, are equally amenable to *in personam* jurisdiction. All of these defendants are wholly owned subsidiaries of ODECO. All have their main offices in the same building at 1600 Canal Street in New Orleans.[11] The by-laws of ODECO Engineers and ODECO International provide that annual stockholders' meetings are to be held in New Orleans. The chief officers and the directors of ODECO and these subsidiaries, including ODECO Canada, are essentially the same. For example, James L. Kilpatrick is president of ODECO International, president of ODECO Canada, chairman of the board of ODECO Engineers, and senior vice-president and a director of ODECO, yet is a paid employee of ODECO and lives and works exclusively out of New Orleans. Similar patterns exist for Wesley J. Wilkinson, Ronald W. Herman, Odie F. Vaughan, William L. Colson, and William B. Weaver. All of these men are officers and/or directors of ODECO as well as one or more of these subsidiaries, but lived in New Orleans and worked in ODECO's New Orleans headquarters. These officers and directors draw their salaries from ODECO, do not keep track of time or expenses spent for each subsidiary, and no formal allocation system exists to keep separate accountings. In addition, the subsidiaries are not always charged for services performed or payments made by ODECO on behalf of the subsidiaries. All liability insurance and most workers compensation insurance was negotiated in New Orleans through ODECO on behalf of its subsidiaries. Although ODECO International purported to bareboat charter the OCEAN RANGER to ODECO Canada, a certain degree of control over the vessel was maintained by ODECO through frequent telex communications, telephone communications, and morning reports transmitted from the OCEAN RANGER to the ODECO offices in New Orleans, and through the frequent transmissions to the OCEAN RANGER from New Orleans of information concerning operations on board the vessel. In addition, ODECO provided training facilities, key supervisory personnel, and even a safety manual for the OCEAN RANGER. Also, ODECO had ultimate control over most important decisions affecting its foreign operations, and authorized most major expenditures by its subsidiaries, by way of telex communications emanating from New Orleans. Moreover, although the February

over the subsidiary and/or determined if an agency relationship exists between the parent and the subsidiary. *See, e.g., Walker v. Newgent,* 583 F.2d 163, 167 (5th Cir.1978); *Lakota Girl Scout Council, Inc. v. Harvey Fund-Raising Management, Inc.,* 519 F.2d 634, 637 (8th Cir.1975); *Products Promotions, Inc. v. Cousteau,* 495 F.2d 483, 492–94 (5th Cir.1974); *Leach Co. v. General Sani-Can Manufacturing Corp.,* 393 F.2d 183 (7th Cir.1968); *Volkswagen Interamericana S.A. v. Rohlsen,* 360 F.2d 437 (1st Cir.1966); *Boryk v. de Havilland Aircraft Co.,* 341 F.2d 666 (2nd Cir.1965). For a succinct analysis of the evolution of these two theories since *Cannon,* see R. Leflar, L.

McDougal, & R. Felix, *American Conflicts Law* at 96 (1982).

**11.** Although ODECO Canada contends that its main office is in Canada, a March 30, 1981 *Resolution of the Directors of ODECO Drilling of Canada* indicates that "the principle place of business of the Company [is] at 1600 Canal Street, New Orleans, Louisiana, U.S.A., 70112." Also, an October 16, 1981 letter from ODECO Canada to MOCAN, concerning an extension of the OCEAN RANGER Drilling Agreement, ODECO Canada lists its address as "Odeco Building —1600 Canal Street, Mail to: P.O. Box 61780, New Orleans, La. 70161."

28, 1980 "Offshore Drilling Agreement" concerning the OCEAN RANGER was between MOCAN and ODECO Canada, ODECO drafted and negotiated the agreement. Furthermore, a June 1, 1977 "Services Agreement" between ODECO and ODECO Canada provided for ODECO, acting on behalf of ODECO Canada and for a fee, to: keep and maintain all books and records of accounts; provide banking services and facilities; arrange for the purchase, order, and delivery of supplies, specialized tools, and services; maintain payroll records and administer the payment of the payroll; and provide any other clerical services requested. Finally, ODECO, through its annual and six months reports, presents a united picture of its world-wide drilling operations to its stockholders and to the public as a whole. Thus, from all of these circumstances, which include common stock ownership, interlocking directorateships, crossing lines of authority, disregard of corporate formalities, and a general merging of rights, duties, and obligations, it is clear that ODECO so dominates these subsidiaries that the subsidiaries are nothing more than mere conduits or instrumentalities through which ODECO conducts its world-wide drilling operations. Therefore, it is not unfair or unjust to hold each of these named ODECO subsidiaries amenable to jurisdiction.

The Court also finds that service on ODECO through C.T. Corporation is effective service on these named ODECO subsidiaries as well. Alternatively, the Court finds that these ODECO subsidiaries have been properly served, pursuant to Fed.R. Civ.P. 4 and Tex.Rev.Civ.Stat.Ann. art. 2031b, by mail, through the Texas Secretary of State.

### 2. *MOCAN*

■ The Texas claimants allege and the Court finds that MOCAN engages in substantial, continuous, and systematic business activities in Texas, and, therefore, is constitutionally amenable to jurisdiction. In the four-year period from 1979 through 1982, MOCAN contracted with 187 different Texas vendors in 1,786 individual transactions worth $124,623,830.88. In addition, Texas businesses were the principal suppliers of goods and services used by MOCAN in its offshore projects, particularly in the Hibernia Field, where the OCEAN RANGER was located at the time of its demise. All of the non-ODECO rigs that MOCAN was operating in the Hibernia Field, including the ZAPATA UGLAND, the ROWAN JUNEAU, the ZAPATA SCOTIAN, and the SEDCO 706, were contracted for in Texas, with Texas contractors, by MOCAN. MOCAN employees physically travelled to Texas to negotiate and contract with Sedco in Dallas, with Zapata in Houston, and with Rowan in Houston. MOCAN also conducted negotiations with these drilling companies by way of telephone calls, telex, and correspondence to Texas. Payments for services rendered by these four rigs were made by MOCAN by mail or wire transfer of funds directly to the respective drilling companies in Texas, not through transfer to any Canadian company. These payments amounted to more than $10,000,000.00 monthly flowing into Texas directly from MOCAN. While "mere purchases [and related forum state training trips], even if occurring at regular intervals, are not enough to warrant a state's assertion of *in personam* jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions," *Hall*, —— U.S. at ——, 104 S.Ct. at 1874, it is clear that MOCAN's Texas contacts go far beyond "mere purchases." In addition to the purchase of material and services from Texas businesses, MOCAN also has had contacts with Texas through Mobil and its other subsidiaries routinely providing technical and accounting services for MOCAN in Texas. For example, Mobil Exploration and Production Services, Inc. processed all of the computer seismological and geophysical data obtained by MOCAN in its offshore exploration efforts, with the actual processing being done in Dallas, Texas. In connection with these technical services, MOCAN employees regularly travel to Texas for consultation, education, training, and development of related spe-

cial skills. MOCAN also received monthly accounting services from Mobil's accounting center in Dallas. MOCAN forwarded all of its intercompany invoices and billings to the Dallas office for processing, listing, and billing. The amount of such inter-company billing involving MOCAN is in the hundreds of millions of dollars annually, all being processed in Dallas. The quality and quantity of all of these Texas contacts make it clear that MOCAN is amenable to jurisdiction in Texas.

Alternatively, the Court finds that the Texas claimants have shown that MOCAN has had sufficient OCEAN RANGER-related Texas contacts to satisfy the minimum contacts standard for amenability to jurisdiction. At least some of the enormous quantity of drilling equipment purchased in Texas by MOCAN was for the OCEAN RANGER. For example, MOCAN purchased several blowout preventers, at a cost of more than $2,500,000.00 each, from Cameron Iron Works in Houston, for use on its rigs, including the OCEAN RANGER. MOCAN not only purchased, made payment for, and took title to this equipment in Texas, but actually sent its employees to Houston from Canada to inspect the blowout preventers for conformance to the specifications required by MOCAN. In addition, it is inevitable that some of the technical, accounting, and training services provided for MOCAN in Texas by other Mobil subsidiaries were directly related to the OCEAN RANGER. This is inevitably true because *all* of MOCAN's needs in these areas were provided by Texas-based Mobil subsidiaries, since MOCAN lacked these internally. These related contacts [12]/ satisfy the due process requirements of the minimum contacts standard. It is not unfair, unjust, or unreasonable to require MOCAN to be subjected to suit in Texas.

The Court also finds that service of process on MOCAN has been perfected by mail, through the Texas Secretary of State, as authorized by Fed.R.Civ.P. 4 and Tex. Rev.Civ.Stat.Ann. art. 2031b.

## B. *Louisiana Actions*

### 1. *MOCAN*

█ The Court finds that the Louisiana claimants have satisfied the two-pronged minimum contacts test, thus rendering MOCAN amenable to jurisdiction in Louisiana. MOCAN has had a long standing relationship with ODECO and Louisiana as a result of contracts for use of the GULF TRADE, the TEMPEST, the OCEAN RANGER, and other ODECO rigs. At the time of its sinking, the OCEAN RANGER, valued at more than $30,000,000.00, was under contract to MOCAN from ODECO Canada. This contract was negotiated and performable in both Canada and Louisiana. Negotiations for the OCEAN RANGER drilling contract were conducted by MOCAN through telephone calls, telexes, and correspondence from Canada to New Orleans. Pursuant to the drilling or charter contract, payments for the operation of the OCEAN RANGER, in the amount of $2,700,000.00 per month, were transmitted by MOCAN to bank accounts in New Orleans, and thereafter ODECO Canada, acting through ODECO employees in New Orleans (who were the only individuals authorized to draw on ODECO Canada's accounts) would draw on these funds. Moreover, this arrangement was followed whenever MOCAN contracted for one of ODECO's rigs. Standing alone, the quality and quantity of MOCAN's Louisiana contacts arising from its negotiation and performance of the Ocean Ranger drilling or charter contract

---

**12.** In *Hall,* the Supreme Court declined to decide:

> (1) whether the terms "arising out of" and "related to" describe different connections between a cause of action and a defendant's contacts with a forum, and (2) what sort of tie between a cause of action and a defendant's contacts with a forum is necessary to a determination that either connection exists.

*Hall,* at —— n. 10, 104 S.Ct. at 1873 n. 10. Thus, while the *Hall* decision provides no guidance on this issue, neither does it preclude the determination made by this Court that the described Texas contacts of MOCAN are related to the present cause of action.

in New Orleans, by means of telephone calls, telexes, correspondence, and wire transfers to New Orleans, easily satisfy the due process requirements of the minimum contacts standard.

In addition to the negotiation and performance of the OCEAN RANGER contract, MOCAN had other OCEAN RANGER-related contacts with Louisiana. The most important of these contacts arise out of MOCAN's relationship with ODECO in regard to the operation of the OCEAN RANGER. Many of the actions filed in Louisiana involve decedents who were Louisiana residents, hired in Louisiana by ODECO or its subsidiaries under an oral employment contract. However, by virtue of the alleged partnership between MOCAN and ODECO in the operation of the OCEAN RANGER, these Louisiana claimants contend that, in addition to being employees of ODECO or its subsidiaries, the OCEAN RANGER crew-members were also employed by MOCAN, under the borrowed servant doctrine. *See Baker v. Raymond International, Inc.,* 656 F.2d 173, 177–79 (5th Cir.1981); *Gaudet v. Exxon Corp.,* 562 F.2d 351, 355–57 (5th Cir.1977); *Spinks v. Chevron Oil Co.,* 507 F.2d 216, 224–26 (5th Cir.1975); *Ruiz v. Shell Oil Co.,* 413 F.2d 310, 312–13 (5th Cir.1969) (setting forth nine factors to be considered in resolving borrowed servant issue). The Louisiana claimants have not conclusively established that their decedents were just nominal employees of ODECO and actual employees of MOCAN. However, at this preliminary stage of the proceedings, conclusive proof is not required. Instead, claimants must make "only a prima facie showing of the facts on which jurisdiction [is] predicated." *Product Promotions, Inc. v. Cousteau,* 495 F.2d 483, 491 (5th Cir.1974). Claimants have made a prima facie showing that their decedents were MOCAN employees borrowed from ODECO or its subsidiaries. This prima facie showing has been established by the following facts. First, MOCAN may well have been "responsible for the working conditions experienced by [these decedents]." *Gaudet v. Exxon Corp.,* 562 F.2d at 357 (this language is the parallel of factors five and six of the *Ruiz* test, as enumerated in *Gaudet* at 355). MOCAN may have been responsible for working conditions aboard the OCEAN RANGER since there was no documentation formally delineating the duties and scope of authority of the OCEAN RANGER's various supervisory personnel, especially as among the ODECO toolpusher, ODECO master, and MOCAN drilling foreman. In addition, the likelihood that MOCAN was ultimately responsible for the working condition of these employees is increased by the fact that all ship-to-shore communications during the storm that caused the OCEAN RANGER's listing and ultimate sinking were between MOCAN employees. Second, the cooperative relationship between ODECO and MOCAN in the operation of the OCEAN RANGER lasted the entire duration of the rig's stay off Newfoundland. Thus, these employees "could be reasonably presumed to have evaluated the risks of the work situation and acquiesced thereto." *Id.* (this language parallels factors four and seven of the *Ruiz* test, as enumerated in *Gaudet* at 355). Resolution of the remaining factors to be considered in determining if these decedents were borrowed servants for MOCAN produces ambiguous results at this point. Since "no one factor or specific combination of factors is determinative of the borrowed employee relationship," *Dugas v. Pelican Construction Co.,* 481 F.2d 773, 778 (5th Cir.1973), the Court is satisfied that the Louisiana claimants have made a *prima facie* showing that their decedents were borrowed by MOCAN as employees. Therefore, MOCAN had another set of significant OCEAN RANGER-related Louisiana contacts, as the possible borrowing employer of a number of Louisiana residents who died while serving on the OCEAN RANGER.

The alleged employment relationship with Louisiana decedents, when coupled with MOCAN's transaction of business in Louisiana, by negotiating a drilling contract for the OCEAN RANGER in Louisi-

ana and by performing that agreement in Louisiana through payments made in Louisiana, renders MOCAN constitutionally amenable to jurisdiction in Louisiana. These activities are intimately related to the causes of action sued upon by the Louisiana claimants. These facts, along with MOCAN's previous dealings in Louisiana with ODECO, demonstrate a purposeful and persistent course of conduct in which MOCAN does substantial business and derives substantial revenues and benefits from goods and services in Louisiana. Moreover, these contacts provide a sufficient basis upon which MOCAN could reasonably have foreseen that its conduct might have grave consequences, culminating in litigation, within this forum. Thus, it is neither unfair nor unjust to require MOCAN to defend this suit in Louisiana.

The Court also finds that service of process on MOCAN has been perfected. Service of process on MOCAN was perfected by mail, pursuant to LSA–R.S. 13:3204, and Fed.R.Civ.P. 4.

### 2. *MHI*

 The Court finds that MHI has had sufficient contacts with Louisiana to render it constitutionally amenable to jurisdiction in this forum, under the minimum contacts standard. Although MHI is a Japanese corporation that is not licensed to do business in Louisiana and that has not designated an agent for receipt of service of process in Louisiana, it has had a significant number of Louisiana contacts. Some of MHI's Louisiana contacts are apparently unrelated to the present causes of action. For example, through its American-based subsidiaries, MHI has appointed two Louisiana distributors for the distribution of its products here. Also, MHI has advertised its products in twenty-five magazines circulated throughout the United States, including Louisiana. In addition, from 1979 through 1982, MHI employees made 129 business trips to Louisiana. At least some of these business trips involved MHI representatives sent to New Orleans to discuss bid proposals and rig specifications for the OCEAN PROSPECTOR, OCEAN KOKUEI and OCEAN BOUNTY, all of which were constructed by MHI for ODECO-affiliated companies. Finally, MHI has entered into at least two contracts with other Louisiana corporations, one for rigidly connected tug barge units and one for self-elevating drilling units.

More important than these unrelated contacts, however, are MHI's significant OCEAN RANGER-related Louisiana contacts. Initially, MHI sent one of its employees, Mr. J. Kawata, an engineer, to ODECO's New Orleans offices to meet with an ODECO employee, Mr. Troxell, for the purpose of soliciting rig construction business. On April 12, 1973, MHI, responding to an ODECO inquiry, corresponded with ODECO in New Orleans by way of a letter indicating MHI's interest in bidding on the construction of the OCEAN RANGER. On September 15, 1973, MHI submitted its bid to ODECO in New Orleans. A substantial portion of the negotiations for the OCEAN RANGER construction contract between ODECO and MHI took place in New Orleans. In fact, from September, 1973 through July, 1976, MHI employees made twenty-nine business trips to New Orleans to meet with ODECO employees concerning the contracting for, and the actual construction of, the OCEAN RANGER. Finally, MHI maintained a bank account in New Orleans for a substantial period of time and received at least $30,000,000.00 for building the OCEAN RANGER. Thus, in light of the above, claimants have successfully carried the burden of showing that MHI's OCEAN RANGER-related Louisiana contacts are of such quality and quantity as to satisfy the minimum contacts standard for constitutional amenability to jurisdiction in this forum. Surely, MHI could reasonably foresee the consequences, including this litigation, arising in Louisiana from the sinking of the OCEAN RANGER. On the basis of claimants' showing thus far, the exercise of jurisdiction over MHI simply does not offend traditional notions of fair play and substantial justice.

**316**

The Court also finds that service of process on MHI has been perfected. Service of process on MHI was perfected by mail, pursuant to LSA–R.S. 13:3204 and Fed.R. Civ.P. 4.

## II. *Forum Non Conveniens*

A number of the defendants also move to dismiss these consolidated actions on *forum non conveniens* grounds. The ODE-CO defendants, the Mobil defendants, and the ABS contend that these actions should proceed in a Canadian forum, while MHI favors a Japanese forum.

Resolution of the *forum non conveniens* issue involves a two-step process. Initially, the Court must ascertain whether American or foreign law will govern the action. In a seaman's personal injury action, the choice of law determination is made pursuant to the multifactor test enunciated in *Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) and *Hellenic Lines, Ltd. v. Rhoditis,* 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970). Once the governing law is determined, the Court can then consider whether dismissal is appropriate under *forum non conveniens.* The actual *forum non conveniens* determination is based on the multifactor interest analysis employed in *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) and *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947).

### A. *Choice of Law*

■ *Lauritzen* is the leading case on the multifactor, maritime choice of law test

applicable to a maritime accident containing both foreign and domestic elements. The *Lauritzen* Court listed seven factors that should be considered in determining whether the Jones Act [13] applies: the place of the wrongful act; the law of the flag; the allegiance or domicile of the injured seaman; the allegiance of the shipowner; the place of contract (*i.e.,* where the employment contract was made); the inaccessibility of a foreign forum; [14] and the law of the forum.[15] *Lauritzen* requires the Court to compare the substantiality of this country's interest in a given action with that of other nations. In defining "the domain which each nation will claim as its own," this Court is instructed to "resolve conflicts between competing laws by ascertaining and valuing points of contact between the transaction and the states or governments whose competing laws are involved." *Lauritzen,* 345 U.S. at 582, 73 S.Ct. at 928. Thus, although American maritime law may be far-reaching under some circumstances, there is little doubt that when the interests of the United States are weak and the interests of another sovereign are substantial, American law does not apply.

In *Rhoditis,* the Supreme Court stated that the list of seven factors in *Lauritzen* is not exhaustive. The Court then added an eighth factor, the vessel owner's base of operations, and indicated that there may be other factors. In addition, *Rhoditis* points out that the *Lauritzen* test is not a mechanical one, and the weight to be accorded

**13.** Although *Lauritzen* involved solely a Jones Act claim, subsequent case law indicates that the choice of law analysis is the same for suits brought under the Jones Act, DOHSA, and general maritime law. *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 382, 79 S.Ct. 468, 485, 3 L.Ed.2d 368 (1959); *Vaz Borralho,* 696 F.2d 379, 384 n. 6 (5th Cir.1983).

**14.** In *Lauritzen,* the Court stated that the inaccessibility of a foreign forum "might be a persuasive argument for exercising a discretionary jurisdiction to adjudicate a controversy; but it is not persuasive as to the law by which it shall be judged." *Lauritzen,* 345 U.S. at 589–90, 73 S.Ct. at 931–32. Apparently relying on this language,

the Fifth Circuit now identifies the availability of an alternate foreign forum as a factor to be considered in *forum non conveniens,* rather than choice of law, determinations. *See, Vaz Borralho,* 696 F.2d at 391–92. Accordingly, this Court will consider this factor in connection with its *forum non conveniens* determination.

**15.** In *Lauritzen,* the Court indicated that the law of forum is an important factor when parties voluntarily submit to suit in the forum, but not when, as here, defendants are involuntarily made parties to the actions filed in this forum. *Lauritzen,* 345 U.S. at 590–92, 73 S.Ct. at 932–33. *See Merren v. A/S Borgestad,* 519 F.2d 82, 83 (5th Cir.1975).

each factor "must be considered in light of the national interest served by the assertion of Jones Act jurisdiction." *Rhoditis*, 398 U.S. at 310, 90 S.Ct. at 1734.

The appellate courts have also spoken in a number of recent cases on the issue of maritime choice of law, particularly as applied in the offshore drilling rig context rather than in the traditional blue water vessel context. *See, e.g., Koke v. Phillips Petroleum Co.*, 730 F.2d 211 (5th Cir.1984), *De Oliveira v. Delta Marine Drilling Co.*, 707 F.2d 843 (5th Cir.1983); *Bailey v. Dolphin International, Inc.*, 697 F.2d 1268 (5th Cir.1983); *Vaz Borralho v. Keydril Co.*, 696 F.2d 379 (5th Cir.), *reh'g denied*, 710 F.2d 207 (5th Cir.1983); *Zekic v. Reading and Bates Drilling Co.*, 680 F.2d 1107 (5th Cir.1982); *Johnson v. J. Ray Mc Dermott & Co.*, No. 80–2378 (5th Cir. Oct. 16, 1981) (unpublished, 660 F.2d 495), *cert. denied*, 456 U.S. 990, 102 S.Ct. 2270, 73 L.Ed.2d 1284, *aff'g per curium & reinstating* 1980 A.M.C. 887 (S.D.Tex.1979); *Chiazor v. Transworld Drilling Co.*, 648 F.2d 1015 (5th Cir.), *reh'g denied*, 659 F.2d 1075 (5th Cir.1981), *cert. denied*, 455 U.S. 1019, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982); *Phillips v. Amoco Trinidad Oil Co.*, 632 F.2d 82 (9th Cir.1980), *cert. denied*, 451 U.S. 920, 101 S.Ct. 1999, 68 L.Ed.2d 312 (1981); *Chirinos de Alvarez v. Creole Petroleum Corp.*, 613 F.2d 1240 (3rd Cir.1980). The most important of these decisions for purposes of the present actions are: *Phillips, Chiazor, Vaz Borralho*, and *De Oliveira*. These decisions are discussed below.

In *Phillips*, the Ninth Circuit upheld the district court's application of Trinidad law, largely because of "Trinidad's strong interest in the conduct of the MARINER I offshore drilling operation." 632 F.2d at 86. *Phillips* involved an accident that killed two and injured twelve, all of whom were Trinidad employees hired in Trinidad, some by an American corporation and others by an American-owned Panamanian corporation, and who were killed or injured in Trinidad territorial waters while working aboard the MARINER I, an American-flag submersible drilling rig that had been stationed off the coast of Trinidad for a num-

ber of years. The Court de-emphasized the significance of the law of the flag and the allegiance of the defendant shipowner, both of which are accorded greater weight in the context of blue water vessels that ply the waters of the world, because the traditional rationale emphasizing these two factors "does not apply to a drilling vessel whose operations are at a fixed location." *Id.* at 87. Instead, the court emphasized the significance of the place of the wrongful act, the allegiance of the injured seaman, and the place of contract, because these factors typically remain "uniform, predictable, and unchanging" in the drilling vessel context.

In *Chiazor*, the Fifth Circuit affirmed the trial court's determination that Nigerian law applied. *Chiazor* involved a Nigerian employee of an American-owned Nigerian firm who was killed while working on board a submersible drilling rig that had been stationed off the coast of Nigeria for several years. The rig was owned by an American-owned Bahamian corporation. The court assumed, for purposes of its decision, that the American parent corporation was the owner of the rig and that the ultimate base of corporate operations was in the United States. However, an American base of corporate operations was held to be insufficient to warrant the application of American law. Instead, given the circumstances surrounding maritime activities involving offshore drilling rigs, the court placed little significance on the vessel owner's ultimate base of corporate operations and placed great significance on the place of the wrongful act, the allegiance or domicile of the injured seaman, and the place of contract. Thus, since all of these latter factors were Nigerian, American law did not apply.

In *Vaz Borralho*, the Fifth Circuit again affirmed the application of foreign law. *Vaz Borralho* involved a Brazilian employee, who was hired in Brazil by an American-owned Brazilian drilling company, and who died as a result of injuries sustained off the Brazilian coast while working aboard the KEY WEST, a Liberian-flag submersible drilling rig that had been sta-

tioned off the Brazilian coast for several years. The court cited and followed its earlier decision in *Chiazor* and the Ninth Circuit's decision in *Phillips*, again emphasizing the special significance in the drilling vessel setting of the place of the wrongful act, the allegiance or domicile of the injured seaman, and the place of contract. Furthermore, the court again considered an American base of corporate operations to be an insignificant factor, stressing instead that the *"day-to-day operating* decisions and activities for the KEY WEST were made and conducted in Brazil." (emphasis in original) 696 F.2d at 389. Thus, since the place of the wrongful act was Brazil, the domicile of the seaman was Brazil, the place of contract was Brazil, and the day-to-day base of operations was Brazil, Brazilian law applied.

In *De Oliveira,* the Fifth Circuit rejected the district court's determination that American law applied. *De Oliveira* involved a Brazilian national, hired in Brazil by an American-owned Brazilian company, who was injured between an American-owned, Panamanian-flag tender vessel and a fixed drilling platform that was operated by an American-owned Brazilian company. The court followed its earlier decision in *Chiazor,* but noted the existence of "factual distinctions that push the present case closer to United States jurisdiction." 707 F.2d at 846. First, while the drilling vessel in *Chiazor* had been stationed off Nigeria for a number of years, the tender vessel in *De Oliveira* had just recently arrived from America. Second, in *De Oliveira,* apparently unlike in *Chiazor,* the tender vessel and the stationary platform were under the control of an American supervisor. However, as in earlier cases, the court emphasized the fact that the accident occurred off

the coast of Brazil, the injured seaman was a Brazilian hired in Brazil, and the day-to-day base of operations was Brazil. The court also emphasized that the American-owned Brazilian corporation that employed the injured seaman was formed at the insistence of the Brazilian government, not in an attempt to evade the obligations of an American vessel owner. Finally, the court noted that "[t]he negligent acts and most of the events causing the vessel to be allegedly unseaworthy occurred in Brazil." *Id.* Thus, the substantiality of the Brazilian contacts far outweighed the American contacts, and, therefore, Brazilian law applied.

The OCEAN RANGER sinking is similar, from a choice of law perspective, to the accidents that gave rise to the above discussed drilling rig cases,[16] except that *only* the OCEAN RANGER sinking claimed the lives of both foreign and American seamen. However, the fact that both foreign and domestic seamen were killed on the OCEAN RANGER makes the choice of law determination much more complicated here than in all of the other drilling rig cases, because the relative substantiality of foreign vis-a-vis American interests is not uniform throughout all of the present consolidated actions.

The increased complexity found in the present choice of law determination, caused by the fact that both foreign and American seamen were killed on the OCEAN RANGER, is best illustrated by applying the multi-factor, maritime choice of law test to the present factual setting. Here, as in *Phillips, Zekic, Johnson,* and *Koke,* both the law of the flag and the ultimate base of corporate operations,[17] two factors accord-

---

**16.** Although the OCEAN RANGER was apparently self-mobil enough to dodge errant icebergs, it was not in any sense a traditional maritime vessel. It had to be towed into place and then anchored to the ocean floor. It spent long periods of time at each drilling location. For example, the OCEAN RANGER had been operating in the same location for almost sixteen months prior to its sinking. Thus, the OCEAN RANGER was clearly engaged in the same type of drilling activities that were in-

volved in all of the drilling cases cited above, and, therefore, the various choice of law factors should be weighted accordingly. *See Koke v. Phillips Petroleum Co.,* 730 F.2d 211, 219 (5th Cir.1984).

**17.** The Court merely *assumes* for purposes of this discussion that the ultimate base of corporate operations was American, though that has not been conclusively established. The Court's earlier finding that a *prima facie* showing was

ed little significance in the drilling rig context, were American. As in all of the other drilling rig cases, the place of the wrongful act [18] and the day-to-day base of operations, two of the four factors accorded substantial weight in the drilling rig context, were in a foreign country, in this instance Canada.[19] However, unlike any of the other drilling rig cases, here both the allegiance of the injured seamen and the place of contract, the remaining two factors given substantial weight in the drilling rig con-

text, are divided between this country, as to those actions filed as a result of the deaths of American crewmen hired in America by American companies, and a foreign country, as to those actions filed as a result of the deaths of Canadian crewmen hired in Canada by Canadian companies.

The unique combination of choice of law factors found in the present consolidated actions mandates a choice of law result different from all of the earlier drilling rig

made concerning ODECO's control over its subsidiaries lends support to this assumption. Moreover, since the ultimate base of corporate operations is not absolutely determinable at this stage of the proceedings, the Court finds it appropriate to resolve this matter in the manner most favorable to plaintiffs.

**18.** For at least two reasons, it would perhaps be more appropriate to refer to this factor as the place of the injury, rather than the place of the wrongful act. The first reason is that this factor is the express equivalent of the traditional *lex loci delicti commissi* choice of law rule, *Lauritzen,* 345 U.S. at 583, 73 S.Ct. at 928, under which most issues in a tort action were generally governed by the law of the place where the injury occurred, since injury is the "last event necessary to make an actor liable for an alleged tort." Restatement (First) of Torts § 377 (1934). *See, e.g., Alabama Great Southern R.R. Co. v. Carroll,* 97 Ala. 126, 11 So. 803 (1892) (Mississippi law applied where negligent act committed in Alabama but injury occurred in Mississippi). *See also* R. Leflar, *American Conflicts Law* § 132 (3d ed. 1977). The second reason is that only if this factor refers to the place of the injury does it make sense to give added weight to this factor in the drilling rig context. This is so, because the place of the wrongful act and the place of the injury need not coincide and, of the two places, it is only the place of the injury that typically remains "uniform, predictable, and unchanging," *Phillips,* 632 F.2d at 87, and therefore entitled to added weight in the drilling rig context. *But see De Oliveira,* 707 F.2d at 846. Thus, this Court finds that the place of the injury in the present actions was off the coast of Canada.

The Court notes that, from the evidence adduced thus far, it appears reasonably probable that the OCEAN RANGER sinking was caused by "a combination of ballast control panel malfunction, operational error, and the design limitation of the OCEAN RANGER ballast pumps." Exhibit 1 attached to the *Supplemental Brief in Support of Canadian Claimants' Motion to Amend the Judgment of This Court Dated June 22, 1983* at 58 (Exhibit 1 is the National Transportation and Safety Board's March 2, 1983 Accident Report concerning the OCEAN RANGER

sinking). From this it is clear that the OCEAN RANGER sinking was probably caused by several wrongful acts, that probably occurred in several different places. Thus, the Court is unable, at this preliminary stage of the proceedings, to determine unambiguously the place of the wrongful act. However, the Court's inability to determine unambiguously the place of the wrongful act is insignificant in the context of the present actions, for a number of reasons. First, the place of the injury, which this Court considers to be the substantial equivalent of the place of the wrongful act, was clearly off the coast of Canada. Second, what was probably the final wrongful act, operational error, occurred off the coast of Canada. Finally, and most importantly, even if a final determination were ultimately made that the place of the wrongful act was America, it would not alter this Court's choice of law determination, because the remaining choice of law factors point overwhelmingly toward application of Canadian law to the actions filed as a result of the deaths of Canadian crewmembers.

**19.** At the time of its sinking, the OCEAN RANGER was located 166 nautical miles offshore, on the high seas rather than in Canadian territorial waters. However, the OCEAN RANGER was clearly operating within the Canadian economic zone. Canada alone had a significant interest in the development of the Hibernia Field, where the OCEAN RANGER had been drilling for sixteen months prior to its demise. The Canadian government required that drilling activities be performed by Canadian entities (here, ODECO Canada and MOCAN). The Canadian government also dictated manning requirements and made numerous other day-to-day decisions concerning the OCEAN RANGER. In short, the OCEAN RANGER's location on the Canadian outer continental shelf, beyond Canadian territorial waters, had little effect on Canadian control over the operation. The OCEAN RANGER was located within the Canadian economic zone and was for all practical purposes an appurtenance thereto. Accordingly, the Court finds that the place of the wrongful act was within the Canadian domain.

cases. Specifically, the Court finds that American law applies to those actions filed as a result of the deaths of American OCEAN RANGER crew members and Canadian law applies to those actions filed as a result of the deaths of Canadian OCEAN RANGER crewmembers. In the actions filed as a result of Canadian deaths, all four of the factors given added significance in the drilling rig context, allegiance of the seaman, place of the employment contract, place of the wrongful act, and day-to-day base of operations, point toward application of Canadian law. These factors are not outweighed by the fact that the law of the flag[20] and the ultimate base of corporate operations were American, especially in the drilling rig context. In the actions filed as a result of American deaths, two of the four factors given added significance in the drilling rig context, place of the wrongful act and day-to-day base of operations, point toward the application of Canadian law and the other two, place of the employment contract and allegiance of the seamen, point toward application of American law. However, as to the actions filed as a result of American deaths, the fact that the law of the flag and the ultimate base of corporate operations were American does tip the balance in favor of applying American law. In short, it is clear to this Court that, under the particular facts of these actions, the quality and quantity of each of these nation's interests in, and contacts with, those claims filed on behalf of its own nationals *far* outweighs the interests and contacts of the other nation.[21]

**20.** The plaintiffs contend that part 1 of Article 6 of the Convention on the High Seas, April 29, 1958, 13 U.S.T. 2312, T.I.A.S. 5200, 450 U.N.T.S. 82, requires the application of American law, because the OCEAN RANGER was an American flag vessel that sank while on the high seas. The Court remains unconvinced that this convention has any real bearing on the contested issues and, even if applicable, is subject to liberal interpretation. For example, the fact that this convention was opened for signing almost three decades ago indicates that the signing parties probably contemplated its application to blue water vessels only and almost certainly did not contemplate its application to more recently developed specialized offshore drilling structures, *such as the semisubmersible OCEAN RANGER*, which remain essentially stationary for long periods of time on the outer continental shelf of one nation. In addition, the Court notes that if plaintiffs' contention (*i.e.*, ships on the high seas are subject to the exclusive jurisdiction of the flag state) were correct, then American shipping interests could avoid a substantial portion of the maritime litigation in this country by simply forming shell corporations in a foreign country and then registering their vessels or rigs under a foreign flag (formation of shell corporations is intended to provide "a genuine link between the [flag] State and the ship." *Id.* at part 1 of Article 5). However, the courts have long disregarded such flags of convenience. *See, e.g., Lauritzen*, 345 U.S. at 587 & nn. 23, 24, 73 S.Ct. at 931 & nn. 23, 24; *Bartholomew v. Universal Tankships, Inc.*, 263 F.2d 437, 442 (2nd Cir.), *cert. denied*, 359 U.S. 1000, 79 S.Ct. 1138, 3 L.Ed.2d 1030 (1959). Finally, the Court notes that, although some of the cited drilling rig cases did involve drilling rigs operating in foreign territorial waters, *e.g., Zekic*, 680 F.2d at 1108, *Phillips*, 632 F.2d at 83–84, and *Chirinos*, 613 F.2d at 1247, in perhaps the two

leading cases in this circuit the Court simply noted that the rig was located off the coast of a foreign country and did not distinguish whether the rigs were on the high seas or within territorial waters. *Vaz Borralho*, 696 F.2d at 382, 387 ("the alleged wrongful act occurred on the Continental Shelf of Brazil" *Id.* at 387 (citing district court's written Memorandum and Order)); *Chiazor*, 648 F.2d at 1016, 1019, 1020. Thus, on the basis of all of the above, the Court finds that, as in other drilling rig cases, the law of the flag is entitled to little weight in the present choice of law determination.

**21.** The Court knows of no authority that would require the application of the same nation's laws to all of the present actions. Plaintiffs essentially argue that the OCEAN RANGER drilling operation must be treated as a single "shipping transaction," *Lauritzen*, 345 U.S. at 582, 73 S.Ct. at 928, requiring one catholic choice of law determination. However, the Court finds it more appropriate to consider each crewmember's employment on the OCEAN RANGER as a maritime transaction for which an independent choice of law determination must be made. The appropriateness of this approach is evident from an analysis of the multifactor *Lauritzen-Rhoditis* test itself, which contains two factors, allegiance of the seaman and place of the contract, that explicitly require individualized treatment. This approach is even more appropriate here, because allegiance of the seaman and place of the contract are two of the four factors accorded added weight in the drilling rig context, and because the foreign seaman contracted in a foreign country with foreign corporate entities formed at the behest of a foreign government, while the American seaman contracted in America with American

### B. *Forum Non Conveniens*

Having determined the applicable law, it becomes appropriate now to determine if any of these actions should be dismissed for *forum non conveniens*.[22] The Fifth Circuit has repeatedly and consistently held that a trial court should not dismiss an action governed by American law, but may dismiss an action governed by foreign law, if there is another more convenient forum. *GAHR Developments, Inc. v. Nedlloyd Lijnen B.V.*, 723 F.2d 1190, 1191 (5th Cir.1984); *De Oliveira*, 707 F.2d at 845; *Bailey*, 697 F.2d at 1274; *Vaz Borralho*, 696 F.2d at 384; *Chiazor*, 648 F.2d at 1017–18. Once a court determines that foreign law governs, it must then consider the various public and private interest factors affected by the choice of forum. Public interest factors include: the administrative difficulties stemming from court congestion; the local interest in having localized controversies decided at home; the avoidance of unnecessary problems in conflicts of law, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty. *Reyno*, 454 U.S. at 241 n. 6, 102 S.Ct. at 258 n. 6. Private interest factors include: the relative ease of access to sources of proof; the availability of compulsory process; the cost of obtaining attendance of willing witnesses; and, all the other practical considerations that make trial of a case easy, expeditious, and inexpensive. *Gilbert*, 330 U.S. at 508, 67 S.Ct. at 843. Ordinarily, a strong presumption exists in favor of the plaintiff's choice of forum, one which may be overcome only when the public and private interest factors clearly favor trial in the alternative forum. *Id.* 454 U.S. at 255, 102 S.Ct. at 265. However, this presumption applies with less force when the plaintiff or real party in interest is foreign. *Id.*

In the present actions, the *forum non conveniens* determination parallels the choice of law determination. The balance of the *forum non conveniens* interest factors strongly favor an American forum for the actions filed as a result of the deaths of

corporate entities. Moreover, viewing an overall drilling operation as a single shipping transaction could, in certain circumstances, have the undesirable result of depriving an American seaman of the benefits of American maritime law. For example, if this Court were constrained to view the OCEAN RANGER drilling operation as a single shipping transaction, it is likely that the overall quantity and quality of Canadian interests and contacts would require the application of Canadian law to the actions filed on behalf of all OCEAN RANGER crewmembers, Canadian and American alike. Thus, when each seaman's employment relationship is viewed as an individual maritime transaction, it is obvious that considerations of comity, reciprocity and long-range interest counsel against the application of American law to those of the present actions that arise out of foreign maritime transactions, those filed as a result of the deaths of Canadian crewmen.

**22.** Since the plaintiffs in the Canadian actions assert claims under American law only, it would appear that a dismissal under Fed.R.Civ.P. 12(b)(6) or 56 might also be appropriate. *See* Comment, *A New Look at Lauritzen v. Larsen, Choice of Law and Forum Non Conveniens*, 38 La.L.Rev. 957, 968–69 (1978). However, Fifth Circuit caselaw mitigates against such a dismissal. First in *Chiazor*, 648 F.2d at 1020 n. 7, and later in *Vaz Borralho*, 696 F.2d at 390–91, the court indicated the availability of this route for the unconditional dismissal of such actions, as opposed to the *forum non conveniens* conditional dismissal. On the other hand, in *Zekic*, 680 F.2d at 1108, decided in the interim between *Chiazor* and *Vaz Borralho*, the court vacated the lower court's unconditional dismissal and remanded the case so that the trial judge might "exercise his discretion [whether to dismiss conditionally or unconditionally] free of the implication in *Chiazor* that [unconditional] dismissal may be an automatic response." While the precedential significance of *Zekic* might reasonably be questioned, because the same appellate panel later decided *Vaz Borralho*, made no mention of *Zekic*, and again indicated the unrestrained availability of unconditional dismissals. However, the moral of these cases is clear: unconditional dismissals are not favored if the plaintiffs might thereby be prejudiced. *See* Murphy, *Admiralty, Fifth Circuit Symposium*, 29 Loy.L.Rev. 537, 572–73 (1983). Here, it would appear that most of the plaintiffs in the actions filed as a result of the deaths of Canadian crewmen would not be prejudiced by an unconditional dismissal, because most have filed suit in Canada as well. However, the Court is not certain that *all* such plaintiffs have filed suit in Canada against all defendants. Thus, the potential for "manipulative practices," *Zekic*, 680 F.2d at 1108, by defendants exists and, therefore, the Court will not dismiss unconditionally.

American crewmen and a Canadian forum for the actions filed as a result of the deaths of Canadian crewmen, provided *all* defendants consent to proceed in a Canadian forum.

As to the actions filed as a result of the deaths of American crewmen, dismissal for *forum non conveniens* is clearly inappropriate. American law applies to these actions, which concern the deaths of American citizens hired in America by American corporations to work aboard an American flag drilling rig. There is a strong local interest in having such localized controversies resolved at home. In addition, most of the relevant witnesses and evidence on the issue of damages are located here. Finally, resolution of these actions by an American court, rather than a Canadian court, would avoid unnecessary problems in conflicts of law and in the application of foreign law. Thus, the balance of the relevant public and private interest factors point toward trial of these actions in this country.

As to the actions filed as a result of the deaths of Canadian crewmen, a conditional dismissal for *forum non conveniens* is clearly appropriate, but only if *all* defendants consent to proceed in a Canadian forum. Canadian law applies to these actions, which concern the deaths of Canadian citizens hired in Canada by Canadian corporations to work on the Canadian outer continental shelf, and most of the plaintiffs are Canadians. Canada has a strong interest in resolving such localized controversies at home. In addition, most of the relevant witnesses and evidence on the issue of damages in these actions are located in Canada. Moreover, if these actions are resolved by a Canadian court, unnecessary problems in conflicts of law and in the application of foreign law can be avoided.

On the other hand, trial of these actions in this forum would be extremely complex and confusing for a jury, if tried together with the actions governed by American law, and would further congest this Court's crowded docket, if tried separately from the actions governed by American law. In addition, trial of these actions in this forum would impose the burden of jury duty on members of a community with little connection to these actions. Furthermore, the presumption in favor of a plaintiff's choice of forum applies with less force here, because almost all of the plaintiffs are foreign. Thus, the public and private interest factors seem to indicate that trial of these actions should proceed in Canada. Nevertheless, the Court cannot dismiss these actions for *forum non conveniens* unless an accessible, alternative forum exists. In *Vaz Borralho*, the Fifth Circuit said "that where American law does not apply an agreement by a defendant to submit to the jurisdiction of the foreign forum will satisfy the [*forum non conveniens*] doctrine's requirement of 'two forums in which the defendant is amenable to process.'" *Vaz Borralho*, 696 F.2d at 392 n. 12. In the present actions, the ODECO defendants and MOCAN have agreed to submit to the jurisdiction of the Canadian courts.[23] However, MHI has not agreed to submit to the jurisdiction of the Canadian courts,[24] and it is not at all clear that MHI is otherwise amenable to process in Canada.[25] If *any* defendant in the actions governed by Canadian law does not consent, or is not otherwise amenable, to jurisdiction in the Canadian courts, then the balance of the public and private interest factors will be radically altered. The public interests of the two fora would be adversely affected in that: this Court would be faced with difficult problems in conflicts of law and in the

**23.** ODECO has also submitted an affidavit indicating that remedies exist and are available to plaintiffs under Canadian law. *See* Affidavit of John J. O'Neill, Q.C., attached to *Motion of ODECO to Dismiss Claims on Grounds of Forum Non Conveniens.*

**24.** MHI's contention that trial should proceed in Japan is entirely devoid of merit. Trial in Japan would not serve the public or private interests of anyone except MHI itself.

**25.** In addition, it is not clear whether the United States of America, which has not moved for dismissal, can or will submit to the jurisdiction of the Canadian courts.

application of foreign law in the actions against the remaining defendants; and, this Court's docket as well as the Canadian court's docket would both be unnecessarily congested by the duplication caused by the splintering of each such Canadian action. The private interests of the Canadian plaintiffs would be adversely affected, because the expensive burden would fall on them of litigating in both Canada and America, if that is necessary for them to obtain full relief. In short, the splintering of individual Canadian actions would adversely affect the public interests of both fora and the private interests of the plaintiffs in those actions. Thus, the Court will enter a conditional dismissal order, as to any action filed as a result of the death of a Canadian crewman, if and when *all* defendants then remaining in that action agree in writing, within ninety days of the entry of this Minute Entry, to fulfill all of the following conditions:

(1) Submit to service of process and jurisdiction in the appropriate Canadian forum in which the Canadian actions have been filed;

(2) Formally waive in the Canadian proceedings any statute of limitations and latches defenses that have matured since the commencement of these actions in American courts;

(3) Formally agree in the Canadian proceedings to make available all relevant witnesses and documents within their control;

(4) Formally agree in the Canadian proceedings that any depositions, answers to interrogatories and admissions filed herein may be used in the Canadian proceedings to the same extent as if they had originated therein; and,

(5) Formally agree in the Canadian proceedings to satisfy any final judgment rendered by such court.[26]

These consolidated actions are before the Court on motion to reconsider the Court's

decision, issued without supporting reasons, concerning various jurisdictional motions.

WHEREFORE, after careful consideration of the arguments of counsel, the relevant facts, the applicable law, and all of the issues raised in the submitted memoranda, the Court hereby AMENDS its Minute Entry of June 22, 1983, as follows:

(1) Motions by defendants, Ocean Drilling & Exploration Company, ODECO International Corporation, ODECO Engineers, Inc., ODECO Drilling of Canada, Ltd., and Mobil Oil of Canada, Ltd., to dismiss for lack of proper service of process are DENIED;

(2) Motion by defendant, Mitsubishi Heavy Industries, Ltd., to quash service of process is DENIED;

(3) Motions by defendants, Ocean Drilling & Exploration Company, ODECO Engineers, Inc., ODECO Drilling of Canada, Ltd., and Mobil Oil of Canada, Ltd., to dismiss for lack of *in personam* jurisdiction, as to those actions originally filed in Texas, are DENIED;

(4) Motions by defendants, Mobil Oil of Canada, Ltd. and Mitsubishi Heavy Industries, Ltd., to dismiss for lack of *in personam* jurisdiction, as to those actions originally filed in Louisiana, are DENIED;

(5) Motion by defendant, Mitsubishi Heavy Industries, Ltd., to dismiss for lack of subject matter jurisdiction, as to the four referenced actions filed as a result of the deaths of Canadian crewmen, is DENIED;

(6) Motions by defendants, Mitsubishi Heavy Industries, Ltd., Mobil Oil of Canada, Ltd., and Mobil Oil Corporation, to dismiss for *forum non conveniens*, as to those actions filed as a result of the deaths of American crewmen, are DENIED;

(7) The Court will enter a conditional dismissal order, as to any action filed as a

26. Of course, nothing prevents the plaintiffs in any Canadian action from voluntarily dismissing their claims against any defendant not agreeing to these conditions. This would enable such plaintiffs to proceed in a Canadian forum against the defendants that do agree to these conditions, and eliminate the adverse consequences of splintering a particular Canadian action.

result of the death of a Canadian crewman, if and when all defendants then remaining in that action agree in writing, within ninety (90) days of this Minute Entry, to fulfill all of the conditions hereinafter set forth.